UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

SACHIN SHAH,

                        **Plaintiff,**

  -against-

JUSTIN S. LUMIERE, STEFAN LORCA
DE ST PIERRE LUMIERE, LESTER L.
LEVY AND JOHN DOES,

                     **Defendants.**

-------------------------------------------------------------x

13 Civ. 2975 (LGS) (SN)

**CORRECTED
AMENDED COMPLAINT**

**(Jury Trial Demanded)**

       Plaintiff, Sachin Shah (Mr. Shah or "Plaintiff"), by his attorneys, The Richard L. Rosen Law Firm, PLLC, for his Verified Complaint, alleges against Defendants Justin S. Lumiere ("Justin Lumiere"), Stefan Lorca De St. Pierre Lumiere ("Stefan Lumiere"), Lester L. Levy ("Lester Levy"), and Jon Doe(s) (unknown party) (collectively, "Defendants") as follows:

**NATURE OF THE ACTION**

    1.  Plaintiff Sachin Shah is a Special Situations/Merger Arbitrage Strategist ("Strategist"), who until recently, had a successful career, and had achieved a degree of notoriety, even appearing regularly on television financial talk-shows.  His commentary is routinely sought in print stories regarding "mergers & acquisitions," "merger arbitrage" and "special situations" within the financial services industry.  He has also established a respectable and profitable book of business.  However, due to the malicious and defamatory acts of Defendants, Mr. Shah's career in his chosen profession has been severely damaged, his good name has been tarnished, he has lost his job, and he is unable to provide services to his portfolio of clients without it.

    2.  From August 2007 through August 2009, Mr. Shah was a former co-worker of Defendants Justin Lumiere and Lester Levy, when he worked on the same research desk at a firm called ICAP, PLC (ICAP).  Defendant Justin Lumiere (at ICAP) worked closely with his brother, Stefan Lumiere, who worked at another firm, Visium Asset Management ("Visium").

1

3.    Defendants have targeted Mr. Shah with a vicious and deliberate campaign to defame him, and destroy his career, in retaliation for Mr. Shah's lawful report in 2009 to the Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA"), alerting them to misconduct on the part of Defendants.   Mr. Shah cooperated with regulators regarding Defendants' potential "front-running," frequent plagiarizing of research product, allowing research product's objectivity to be compromised, market manipulation, and posting of comments on message boards during the research report generation process.   Defendants are now seeking vengeance because Mr. Shah upset their highly profitable and improper conduct.

4.    FINRA and the SEC did investigate Mr. Shah's claims (and/or may still be investigating them), and FINRA has already sanctioned Defendant Lester L. Levy in 2011 (who is also an attorney) for misconduct connected with Mr. Shah's complaints, and for lying to investigators. ICAP was further sanctioned in 2009 by the SEC for *inter alia* fraud, failure to supervise, engaging in deceptive broking activity, and making material misrepresentations to its customers concerning trading activities.

5.    Unbeknownst to Shah until recently, in retaliation for Mr. Shah's past cooperation with regulators, Defendant Justin Lumiere, aided and abetted by, and acting in consort with, the other Defendants, apparently launched a multi-year campaign of defamation to destroy Mr. Shah's career. For years, he has sent "anonymous" false and defamatory e-mails to Mr. Shah's employers, as well as to law enforcement agencies and securities regulators, accusing Mr. Shah of crimes, and defaming him in his chosen profession.   Only recently, in 2012, did Justin Lumiere begin using his own name.

6.    In the past several months, Defendant Justin Lumiere sent Mr. Shah two threatening e-mails from two separate "yahoo" accounts he apparently created for the purpose, ireallyreallyhatesachinshah@yahoo.com and sachindaloser@yahoo.com.   Justin Lumiere threatens in these e-mails *inter alia* that; "**you are done in this industry… i will make it my mission in life to make sure you keep getting fired from jobs.  hahahahaha.**" (1/7/13 E-mail).  Justin Lumiere also specifically references Defendants' retaliatory motive, stating that "**payback is a bitch**." (3/6/13 E-mail).

7.    Defendant Justin Lumiere "made good" on his threats.  In March of 2013, Mr. Shah started work for a new employer, Cuttone & Co.  Only two business days after Mr. Shah began working at

his new job, Defendant Justin Lumiere sent Mr. Shah's new employers a string of e-mails in March and April of 2013 that were defamatory *per se* (attached hereto), which *inter alia* falsely stated that Mr. Shah (1) had committed and was committing crimes (notably, securities manipulation and front-running – what Mr. Shah informed regulators that the Defendants were doing in 2009), (2) that Mr. Shah was, and is, under investigation by multiple law enforcement offices and regulators for this conduct, and (3) that Mr. Shah had been fired from every job he ever had because of this misconduct. Justin Lumiere then further threatened Mr. Shah's new employer with costly and extensive regulatory inquiry over these false accusations. These e-mails ultimately led to Mr. Shah's termination.

8. Incredibly, even after Mr. Shah was terminated, Mr. Lumiere couldn't resist sending Mr. Shah another e-mail that stated: **"I just got you fired from Cuttone…I told you… I will follow you to the ends of this earth to make your life as miserable as you made mine and everyone else's…"** (4/11/13).

9. Upon information and belief, this campaign of defamation, tortuous interference, and malicious prosecution may have started in as early as 2009, although unbeknownst to Shah, and Defendants may have been secretly interfering with his jobs, and defaming him for years. Further, Defendants have made it clear that they will continue to interfere with Mr. Shah's career, unless they are stopped.

10. What makes this vendetta particularly troubling is Defendants' brazen, intentional, and reckless disregard for Mr. Shah's rights, when they are supposed to be conducting themselves in accordance with the positions of power and responsibility that they have been granted. The Lumiere family is relatively prominent in the financial services industry. Defendant Lester Levy is a lawyer, and should be conducting himself as such, with a high standard of conduct. Justin Lumiere is (or was at all relevant times) a regulated person in the securities industry, and was a position of trust working for another financial services firm (MKM Partners LLC). Stefan Lumiere, at all relevant times, was a regulated person, and was a Special Situations Investments-Portfolio Manager at Visium, which has approximately $3.5 billion dollars assets under management.

11. However, Defendants are clearly on a vendetta motivated by retaliation and malice, and Defendants will not stop unless this Court takes action to prevent them from further damaging Mr.

Shah's reputation, harassing him, interfering with his ability to obtain new employment, and preventing him from earning a living in his chosen profession.

12. Mr. Shah therefore brings this action against Defendants for defamation (including defamation *per se* and defamation by implication), tortious interference with contract, tortious interference with prospective economic advantage, malicious prosecution, and civil conspiracy and aiding and abetting the same. Mr. Shah is seeking damages including actual damages, compensatory damages, special damages, punitive damages, interest, attorney's fees and costs, as well as injunctive and other relief, seeking to prohibit Defendants from engaging in like misconduct in the future.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) (Diversity Jurisdiction), as Plaintiff resides in the State of New Jersey, Defendants Lester Levy and Stefan Lumiere are domiciled in the State of New York, Defendant Justin Lumiere is domiciled in either Florida or New York, and the amount in controversy "exceeds the sum or value of $75,000, exclusive of interest and costs" under 28 U.S.C. §1332(a).

14. Venue is proper in this district, pursuant to 28 U.S.C. §1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in the Southern District of New York. Defendants are located in this county, and many of the alleged acts leading to the cause of action arose in this County (including but not limited to the defamatory e-mails that were sent from and to physical locations in New York County).

## THE PARTIES

15. Plaintiff Sachin Shah, at the time of the filing of the Complaint, was domiciled and resided in Essex County, New Jersey, and he continues to reside in Essex County, New Jersey.

16.     Upon information and belief, Defendant Justin Lumiere resides in New York County, New York at 303 Park Ave. S. 1250, New York, NY 10010-3601. Defendant Justin Lumiere's employment with ICAP ended in October of 2009, after which he since has worked at Summit Securities Group LLC (Oct. 2009-July 2010), GFI Securities Inc. (Sept. 2010 – to July 2012), and MKM Partners LLC July 2012 to April 2013), and is not currently employed in the securities industry.

17.     Defendant Stefan Lumiere, at the time of the filing of the original Complaint, was domiciled in New York residing in New York County, New York, and at all relevant times, conducted business regularly in New York at his place of business, Visium Asset Management Inc. ("Visium").  He is not currently employed in the securities industry.

18. Defendant Lester Levy III, Esq. ("Lester Levy"), at the time of the filing of the original Complaint, was domiciled in New York residing in New York and working as an attorney in New York County, New York at Tripp Capital, located at 125 E. 82nd St., New York, New York.

19. Jon Doe(s) are person(s) whose identity is as of yet unknown, who drafted and sent the e-mails defaming Mr. Shah, or otherwise were wrongfully involved in the defamatory acts, malicious prosecution, and tortious interference complained of herein.  Plaintiff has included the unknown defendant(s) under CPLR 1024, should it be revealed that they are different than the other defendants already identified herein, including but not limited to the e-mail accounts ireallyreallyhatesachinshah@yahoo.com, sachindaloser@yahoo.com, and justin_lumiere@yahoo.com.  Although the e-mails in question appear on their face to be authored and sent by Justin Lumiere, the unknown defendant(s), Jon Doe(s), are included out of an abundance of caution.  Upon the use of appropriate discovery, including third party discovery, and the potential use of a computer expert, the identity of Jon Doe(s) can be determined.

## FACTUAL ALLEGATIONS

20. Sachin Shah possesses Series 7, 86, and 87 and 63 Licensure in the securities industry.

21. Plaintiff Sachin Shah is a Special Situations/Merger Arbitrage Strategist ("Strategist"), who until recently, had a successful career.

22. Mr. Shah previously worked at ICAP, PLC ("ICAP") (from Aug. 2007-Aug. 2009), at Capstone Global Markets, LLC ("Capstone") (from Dec. 2009 - July 2011), Tullett Prebon Financial Services, LLC ("Tullett Prebon") (from July 2011 – December 2012), and lastly at Cuttone & Co., Inc. ("Cuttone") (from March 2013-April 2013).

23. Mr. Shah has achieved a degree of notoriety and regard in his profession, and appears regularly on television financial talk-shows regarding general trends in Mergers and Acquisitions (M&A), merger arbitrage and in "special situations" in the financial services industry.  He has been appearing regularly on Canadian BNN, Bloomberg and Reuters (quarterly-basis), he has been

interviewed regularly by Bloomberg reporters, and generally has been invited by the press for commentary on a wide variety of M&A, merger arbitrage and special situations in the marketplace.

24. Mr. Shah has had to work extremely hard to build his book of business, and gain the level of expertise that his clients value.  Therefore the client book he has assembled, and his reputation, are his own, and the direct result of over a decade of hard work, and if lost, or he is no longer able to work for them, it will mean the destruction of his career.

25. Mr. Shah's clients value his hard work, in-depth knowledge and trading strategies concerning merger arbitrage, special situations, and other related event-driven strategies, as well as his analytical skills which have allowed him to cultivate a book of business over the years.

26. For Mr. Shah to benefit from his hard work, commentary, analysis and trading strategies, he must be affiliated with a regulated securities entity, so he can properly give, and be compensated for, his services.

27. Mr. Shah's clients will not wait indefinitely for him to find another position so they can work with him.

28. Due to the malicious and defamatory acts of Defendants (described herein), Mr. Shah's career in his chosen profession has been severely damaged, his good name has been tarnished, and he has lost at least one job (including his most recent one at Cuttone & Co.), and finds himself unemployed and unable to provide services to his portfolio of clients.

29. Further, Defendants are continuing on their vendetta, and making it impossible for Mr. Shah to find a job, as they continue sending defamatory e-mails to his employers and regulators.

30. Defendants are doing this, knowing full well that the longer Mr. Shah is kept out of an active role in the industry, the more likely his client base will evaporate, and the more harm they will do him.

**Background at ICAP**

31. In or about late August of 2007, Mr. Shah first began working at ICAP, PLC, a London-based firm that specializes in interdealer brokerage services and providing post trade risk and information services ("ICAP").

32. From August 2007 through August 2009, he worked as a Sr. Special Situations / Merger Arbitrage Analyst at ICAP.

33. The Research Desk at ICAP that Mr. Shah worked on was the Special Situations / Risk Arbitrage Group, and the desk generally concentrated on generating research product, including generating research concerning merger arbitrage, special situations (including "event-driven") and various industry sectors.

34. At ICAP, Mr. Shah directly reported to Defendant Justin Lumiere, who was a Director, and Head of Special Situations / Risk Arbitrage Group. Justin Lumiere ran the Special Situations / Risk Arbitrage research desk at ICAP as "Team Manager in the U.S."

35. Defendant Lester Levy also worked on the same research desk as Mr. Shah, as a Legal Analyst, but did not possess the licensure that Mr. Shah did until around April 2008 or nearly 10 months after joining ICAP.

36. During Mr. Shah's employment at ICAP, he worked closely with Justin Lumiere and Lester Levy on a day-to-day basis.

**Mr. Shah Became Aware of Misconduct by Defendants at ICAP**

37. Mr. Shah became aware of improprieties at ICAP in the way that Justin Lumiere and Lester Levy conducted their duties.

38. Justin Lumiere and Stefan Lumiere (Justin Lumiere's brother) were extensively and improperly communicating with each other, often throughout the day, regarding the same merger arbitrage and special situations companies that Justin Lumiere and the rest of the desk were covering at ICAP.

39. Defendant Stefan Lumiere, at all times relevant to this matter, was also a regulated person, and a Special Situations Investments-Portfolio Manager at Visium Asset Management ("Visium"). Visium Asset Management manages approximately $3.5 billion in assets under management ("AUM"). Stefan Lumiere's employment at Visium ceased on or about the week of April 29, 2013.

40. Stefan Lumiere was involved at Visium on the trading side (buy side), and traded many of the same merger arbitrage and special situations securities, as well as securities in the health care industry, which the research desk at ICAP (run by his brother Justin Lumiere) was concurrently covering with its research.

41. Mr. Shah was present on many occasions where he heard Justin Lumiere discussing with his brother (usually over his cell phone) a particular special situation, or the coverage of a particular company, while the research at ICAP was still being finalized, and had yet to be issued by ICAP.

42. Justin Lumiere often used a separate cell phone to discuss these matters with his brother, Stefan Lumiere, at Visium. Lester Levy carried with him three separate cell phones, one of them disposable. This was done, upon information and belief, so the Lumiere brothers and Mr. Levy could have conversations that were not recorded or monitored by compliance.

43. Sometimes, Justin Lumiere would leave the desk, directly stating that he had to go (during the trading day) to meet with his brother, or others, at Visium.

44. Mr. Shah was extremely uncomfortable with the communications the Lumiere brothers were having, and the implications it raised concerning manipulation, front-running, and trading upon analysis and information in research reports that were yet to be released.

45. Mr. Shah was also concerned that the research that was being generated might be unduly influenced by positions that Stefan Lumiere and/or Visium might be taking, or have already taken.

46. Since the research coverage at ICAP was in the same general area (merger arbitrage, special situations, as well as certain healthcare situations and companies) as the coverage that Stefan Lumiere had at Visium Asset Management (also merger arbitrage, special situations), and often was regarding the same company (or special situation) that Visium or its clients likely had positions in, the constant communication between the brothers was concerning to Mr. Shah.

47. Further, Mr. Levy (who was also on the desk) would work closely with Justin Lumiere, and often leak information about (or otherwise comment about) the same securities or special situations that ICAP was covering, directly to the public through fictitious names on internet message boards, chat rooms, or "blogs," prior to the issuance of ICAP's research.

48. In addition, Mr. Levy (who upon information and belief did not possess the same licensure as Shah), would often plagiarize research analysis form other sources, and use it in research reports, as his own. For example, Mr. Levy in one research report covering ROH/DOW, deliberately plagiarized legal analysis from a Canadian law firm, and inserted almost verbatim into the ICAP's published ROH/DOW research report, without conducting his own research, or giving any attribution to its source. Therefore, the ICAP research report on ROH/DOW that was published (sent to clients)

8

in March 2009, did not contain independent analysis and recommendations, the service that ICAP's clients were paying for, and was inaccurate (as it was not independently researched, and failed to properly attribute the plagiarized research back to the Canadian law firm).

49. Since they all (Mr. Shah, Justin Lumiere, and often Mr. Levy as well) shared attribution of the authorship of the research product from the desk that was distributed through ICAP, Mr. Shah's name was connected to research reports that Mr. Shah was concerned were plagiarized, compromised, and inaccurately represented to clients that they had been independently researched and analyzed.

50. Justin Lumiere (supervisor of the research and of the Merger Arbitrage and Special Situations desk) was fully aware that the research reports contained inaccuracies, and were potentially compromised, and contained research that was plagiarized and "passed off" as ICAP's own (without actually researching the situation). However, Justin Lumiere would ask Mr. Shah to "regulatory sign off" on research (as he possessed licensure to do so) and send it via email to clients. Mr. Shah had not reviewed the research, and knew to be plagiarized and/or compromised. When Mr. Shah refused, or indicated that the research should be properly reviewed, he was berated and threatened by Justin Lumiere.

51. On one occasion in April 2013, Justin Lumiere verbally attacked Mr. Shah and told him if a "published report" that Justin Lumiere wanted Mr. Shah to "regulatory sign off" on wasn't sent to clients immediately, he would "be fired." Additionally, Justin Lumiere wanted to have Mr. Shah send it from ICAP's research e-mail distribution (thereby appearing as if Mr. Shah had reviewed and/or authored it),

52. Mr. Shah notified Justin Lumiere's superiors via e-mails and meetings of the issues on the desk (including but not limited to during Oct. 2007, Feb. 2008, August 2008, and from Fall of 2008 through in or about January of 2009), including Gregory F. Murphy, the Chief Operating Officer of ICAP. Mr. Shah therefore complained internally about the improprieties. However, nothing was done to curtail the improper activity, and Shah was increasingly marginalized and ostracized by Justin Lumiere.

**In February 2009, Mr. Shah Alerted Regulators About the Improper Activity at ICAP**

53. Mr. Shah had complained about serious misconduct at ICAP, but received no assistance from management at ICAP regarding his concerns with Defendants' misconduct.  Further, his name was on research reports he knew to be compromised, plagiarized, or worse, designed to intentionally manipulate the market.

54. His complaints to senior management, including Gregory Murphy (COO of ICAP), had fallen on deaf ears.

55. Further, Defendant Justin Lumiere continued to insist on using Mr. Shah's name on research, and pressure him to "regulatory sign off" on research product he feared was compromised by Defendants' improper conduct.

56. By 2009, Mr. Shah, having exhausted all internal avenues at ICAP to correct the situation, and fearing an association between his name and illegal conduct, alerted the authorities, including the SEC (and through them, FINRA.)  In addition, seeing the manner in which management had reacted to his concerns, he was afraid the Lumiere brothers, and Mr. Levy, were potentially going to lay the blame on him for the misconduct they were engaging in, should it be discovered, especially given Justin Lumiere's insistence that Mr. Shah "regulatory sign off" on the reports.

57. Having nowhere else to turn and fearing that he would be connected to the improper conduct, Mr. Shah started sending e-mails to regulators regarding the situation at ICAP in or about February 2009, and cooperated with them in the Spring and Summer of 2009, as they investigated various issues at ICAP.

58. Shortly thereafter, Mr. Shah was put on "garden leave" in or about May of 2009, for the remainder of his 2-yr. contract, which expired in August of 2009.  Mr. Shah ultimately left ICAP in August of 2009, at the expiration of his contract term.  He was not "fired."

59. Apparently, and unbeknownst to Mr. Shah until recently, FINRA investigated Mr. Levy, and formally sanctioned him for his misconduct (during 2008 and 2009) on June 15, 2011.

60. A true and correct copy of a June 15, 2011 FINRA Dept. of Enforcement Order, Disciplinary Proceeding No. 2009018050201, attached hereto as "Exhibit A," sanctions Defendant Levy by suspending him for 6 months, and fining him $5,000.  The sanctions are for *inter alia* using fictitious aliases on internet chat rooms and blogs to discuss research being covered at ICAP in

10

advance of ICAP's release of the actual report, and lying to investigators in June of 2009, when Defendant Levy was questioned about it. Notably, this was some of the same misconduct being reported by Mr. Shah only months before.

61. In addition, as ICAP was investigated by regulators, they were found to be in violation of a number of securities laws, leading ultimately to the SEC fining them $ 25 Million Dollars in December of 2009 (See e.g. December 18, 2009 press release issued by Securities and Exchange Commission at www.sec.gov). Notably, the SEC individually named and fined Gregory F. Murphy, the Chief Operating Officer of ICAP that oversaw Justin Lumiere, and to whom Mr. Shah complained regarding Defendants' actions.

62. Upon information and belief, Defendants' conduct was investigated by the SEC and/or FINRA as a result of, at least in part, Mr. Shah's concerns.

63. Upon information and belief, Defendants believed, or otherwise learned, that Mr. Shah had gone to regulators with his concerns, and blamed Mr. Shah in whole, or in part, for the investigation into their activities at ICAP.

64. Further, upon information and belief, the "spotlight" of investigation made it impossible for the Lumiere brothers to continue their activities, and interrupted the constant stream of communication between ICAP and Visium, which potentially upset their capacity to make a great deal of profit (however improperly).

65. Upon information and belief, Defendants' motivation and malice for engaging in the defamatory campaign against Mr. Shah, and desire to destroy his career, stems from their blaming Mr. Shah for assisting regulators, and interrupting what was likely an extremely profitable relationship (albeit probably an illegal one) between the Lumiere brothers, and their sharing of information, coupled with Mr. Levy's usage of the media in advance of research reports being released by ICAP, in part to manipulate the market, and in part to give the impression that he was providing credible legal analysis, thus trying to improve his own credibility of usage of the media in advance of research reports being released by ICAP.

**In December 2009, Only A Few Days After Mr. Shah Was Hired at Capstone,
An "Anonymous" Defamatory E-mail Was Sent to Shah's New Employers**

66. After ICAP, Mr. Shah found a new job and started working at Capstone Global Markets, LLC ("Capstone") in or about December of 2009.

67. Mr. Shah, his employers, and many persons who work in the financial services industry, are subscribers (or their firms are subscribers) to "Bloomberg Terminals" (which includes Bloomberg Professional Service Software).

68. The Bloomberg Terminal is in extremely wide usage, and includes an individual user account (identifying an individual user), which is linked to a broad network of other users in the financial services industry, all of whom can communicate and see information about each other's accounts, including where they are currently associated (or employed).

69. Mr. Shah, when he became employed in his new job at Capstone, had his Bloomberg Terminal ID automatically updated to reflect his new employment.

70. Defendants, as they also had access to Bloomberg Terminals, could therefore see that he had obtained new employment from his Bloomberg Terminal "account" information.

71. Upon information and belief, and unbeknownst to him at the time, Mr. Shah's new employers at Capstone, and certain regulators, received an anonymous e-mail communication, warning them that Mr. Shah was being investigated by regulators, and had engaged in illegal activity.

72. Upon information and belief, Defendants discovered Mr. Shah had acquired new employment, as it was apparent through the Bloomberg Terminal system, and thereafter maliciously authored and/or sent the anonymous e-mail.

73. Defendants' actions were motivated by malice, and a desire for revenge against Mr. Shah, because of his cooperation with regulators regarding Defendant's malfeasance at ICAP in 2009.

74. Upon information and belief, this anonymous e-mail was authored and/or sent by one or more of the Defendants, acting in consort with and/or aided and abetted by, the other Defendants.

75. Defendants, who were in the securities industry already, and one of whom was a Lawyer (Lester Levy), were aware of what allegations would be most harmful to Mr. Shah, and how to keep their malfeasance from being directly discovered by Mr. Shah.

76. Defendants intended to keep their identity secret.

77. Further, by concealing their identity, by making the e-mail anonymous, Defendants intended that Shah would not learn that they were defaming him, and/or tortiously interfering with his new employment at Capstone.

78. In addition, because of the nature of the communication, a "anonymous tip" that purported to be a whistle-blower in the securities industry (where such communications are generally kept confidential and investigated by firms without the knowledge of the person who they are targeting), Defendants intended, and succeeded, in keeping their identity, and defamation of, Mr. Shah a secret.

79. Thankfully for Mr. Shah, Capstone Global Markets, LLC ("Capstone") did not terminate Mr. Shah's employment, and perhaps due to the anonymous nature of the communication, did not believe it to be true after they, upon information and belief, conducted an investigation.

80. However, the defamatory communication is believed to have been transmitted in December of 2009 by one of the Defendants, without Mr. Shah's authorization or privilege, and was 'of and concerning' Mr. Shah. This defamatory e-mail and made false accusations about Mr. Shah, accusing him of misconduct in his profession, and accusing him of a crime (violations of securities laws and regulations), and otherwise caused him damage.

81. Defendants intended to interfere with Shah's employment with Capstone.

82. Defendants actions were motivated by malice, and a desire for revenge against Mr. Shah because of his cooperation with regulators regarding Defendant's malfeasance at ICAP.

83. Although Mr. Shah was not terminated as a result of the e-mail, upon information and belief, the e-mail did cause Mr. Shah harm, and upon information and belief, initiated an internal investigation into Mr. Shah at Capstone.

84. Mr. Shah did not learn of the existence of the e-mail, or the investigation by Capstone, until years later.

85. Mr. Shah worked successfully at Capstone Global Markets, LLC from Dec. 2009 through July of 2011.

86. In the summer of 2011, Capstone decided to close its brokerage business, and therefore Mr. Shah (along with everyone in Capstone's brokerage business) needed to find new employment. Mr. Shah's employment with Capstone ended in July of 2011. He was not "fired" by Capstone, rather the job ceased to exist.

13

**Mr. Shah is Again Defamed by an Anonymous Source in July of 2011**
**Again Only a Few Days After He Started a New Job at Tullett Prebon Financial Services**

87. Following the closure of Capstone's brokerage business, Mr. Shah obtained new employment with Tullett Prebon Financial Services in July 2011 ("Tullett Prebon").

88. Again, only a few days after Mr. Shah received his new Bloomberg Terminal identification, showing he had gained employment with Tullett Prebon, an anonymous e-mail was sent to Tullett Prebon, and upon information and belief, to FINRA.

89. Upon information and belief, Defendants had access to Bloomberg Terminals of their own, (with the possible exception of Mr. Levy, who had just been suspended by the Division of Enforcement the month before) and could see that Mr. Shah had just started employment with his new company.

90. Upon information and belief, one of the Defendants sent this e-mail, acting in consort with and/or aided and abetted by, the other Defendants.

91. The e-mail was concerning Mr. Shah, and falsely accused him of committing securities law violations, and otherwise injured him in his trade, business and profession, by accusing him of improper and illegal conduct.

92. Defendants' timing of this anonymous e-mail was intended to maliciously interfere with Mr. Shah's employment, as he had just started working for Tullett Prebon, and had not yet been able to build any personal relationships with his new employers.

93. Upon information and belief, Defendant Levy was additionally motivated to harm Mr. Shah, as only the month before (June 15, 2011) he had been sanctioned by FINRA.

94. Upon information and belief, this anonymous e-mail was either forwarded by one of the Defendants to person(s) at FINRA, or a second e-mail was also sent to FINRA regarding Mr. Shah, similarly accusing him securities law violations, and/or otherwise defaming him in an manner that injured him in his trade, business and profession, by accusing him of improper and illegal conduct.

95. Defendants, however, knew these accusations were false, and were maliciously making them so as to harm Mr. Shah, to interfere with his contract with Tullett Prebon, to get FINRA to "investigate" Mr. Shah and/or to ultimately get Mr. Shah terminated from Tullett Prebon..

14

96. Defendants did succeed in harming Mr. Shah, and interfered with his employment contract negotiations (which were still ongoing at the time, affecting the negotiation of key terms).

97. Defendants also succeeded in harming Mr. Shah, as another internal investigation was commenced concerning him by Tullett Prebon, as to whether he committed securities violations.

98. In addition, upon information and belief, FINRA had been contacted by Tullett Prebon in response to Defendant's anonymous e-mail(s).

99. Upon information and belief, Tullett Prebon conducted an investigation, and ultimately determined in or about August 2011 that the anonymous e-mail had falsely accused Mr. Shah, and there was no basis to the allegations contained in it. However, Tullett Prebon did not, and refused to, share the e-mail with Mr. Shah.

100. Tullett Prebon also informed Mr. Shah that in its investigation, it had learned of a similar anonymous e-mail that had been sent to Mr. Shah's previous employer (Capstone), and that it had similarly accused Mr. Shah of the same misconduct.

101. Mr. Shah therefore now knew that someone was sending these anonymous e-mails, but did not know who was engaging in the misconduct, nor did he have access to the e-mails or their precise allegations.

102. Capstone never mentioned, nor did they allow Mr. Shah to see or review the anonymous e-mail they had received.

103. Tullett Prebon briefly allowed to Mr. Shah to see only the physical email.

104. The e-mail Mr. Shah was briefly allowed to see was anonymously sent, and falsely accused him of committing securities law violations, and accused him of being under investigation for improper and illegal conduct.

105. Tullett Prebon conducted an investigation and required that Mr. Shah produce some sample emails and analyses sent to clients, TV interviews links, comments made to reporters, and other materials to provide to FINRA, per Tullett's request. Mr. Shah prepared a package of his works, which now, upon information and belief, was sent to FINRA as part of Tullett's investigation.

106. This investigation process was occurring immediately following Mr. Shah's hiring, and tainted Mr. Shah's employment, by creating concern with his new employers regarding the false allegations.

15

107.     Upon information and belief, the involvement of FINRA, as well an internal investigation, were costly and time consuming endeavors for Tullett Prebon.   This in turn made Tullett Prebon's hiring and continued employment of Mr. Shah less desirable to Tullett Prebon, further harming Mr. Shah.

108.     Within a few months, Tullett Prebon informed Mr. Shah that it and FINRA had concluded that Mr. Shah had not engaged in any wrongdoing either at ICAP, or at Capstone Global Markets, and indicated to Mr. Shah for the first time that FINRA had also received (or at least been forwarded) an anonymous e-mail at or about the same time as the July 2011 e-mail.

109.     Mr. Shah at this point suspected that the Defendants and/or others at ICAP might be involved with the "anonymous" e-mail, but he had no concrete proof, and the identity of the Defendants remained secret.

**In November 2012, Another E-Mail is Sent to Tullett Prebon By Defendants**

110.     Mr. Shah continued working at Tullett Prebon, and hoped that the "anonymous" e-mails had been dealt with, and the entire situation was behind him.

111.     However, unbeknownst to him, Defendants again attempted, and succeeded, in interfering with his job at Tullett Prebon by complaining to regulators.

112.     On November 13, 2012, Justin Lumiere apparently sent the attorney general's office of Massachusetts on one or more e-mails defaming Mr. Shah, alleging that he was engaged in "illegal trading."

113.     Upon information and belief, these e-mails were addressed from Justin Lumiere's e-mail account justin_lumiere@yahoo.com, and were sent to the e-mail address lynda.freshman@state.ma.us, belonging to one Lynda A. Freshman, Legal Analyst/Mediator, Insurance and Financial Services Div., Public Protection and Advocacy Bureau, Off. of Attorney General Martha Coakley, at the Massachusetts Attorney General's Office.

114.     Upon information and belief, Justin Lumiere (acting with, or aided and abetted by Defendants) also forwarded this e-mail to Tullett Prebon in or around November 2012, claiming that Mr. Shah was "under investigation" by the Attorney General of Massachusetts for "illegal trading."

115.     Upon information and belief, there either was no investigation by the Massachusetts Attorney General "looking into" any "illegal trading" on the part of Mr. Shah, so the e-mail was

false, or it similarly was defamatory by implication, as the implication it drew was that any "investigation" was *bone fide*, when in fact, it was only because Defendants themselves had initiated it through their own false claims/ report.

116.     Upon information and belief, Defendants may have also sent one of more similar e-mails to FINRA, and then similarly forwarded them to Tullett Prebon, again to create the false impression that there a *bone fide* investigation into Mr. Shah for "illegal trading."

117.     These e-mails did interfere with Mr. Shah's employment contract with Tullett Prebon.

118.     By December of 2012, Mr. Shah had been denied a bonus, told his base salary was going to be significantly reduced, and ultimately was forced to leave Tullett Prebon.

119.     As a further result, Mr. Shah, now unemployed, could not service his clients, and risked losing them to other competition, as Mr. Shah needed to be affiliated with a regulated employer to provide his full services, and be appropriately compensated.

120.     Mr. Shah did not, at the time, know why he had had his earnings drastically reduced, and was ultimately forced to leave Tullett Prebon, but only learned of the additional e-mail campaign by Defendants later in time.

**On January 7, 2013, Mr. Shah Received a Threatening E-Mail from**
**Justin Lumiere, Within a Week of Leaving Tullett Prebon**

121.     After Mr. Shah lost his employment with Tullett Prebon, he was actively looking for employment, and scrambling to maintain the confidence of his client base.

122.     On January 7, 2013, Mr. Shah received a strange and threatening e-mail from Justin Lumiere, only approximately one week following his departure from Tullett Prebon, which was sent to his Bloomberg Terminal e-mail account, as well as his personal yahoo e-mail address, stating as follows:

> Subject: Sucker – lost another job
>
> You are done in this industry….i will make it my mission in life to make sure you keep getting fired from jobs.
>
> hahahahaha

The e-mail was sent from the yahoo address "ireallyreallyhatesachinshah@yahoo.com," but bore the identifying name "Justin Lumiere," as whomever had set up the account had identified themselves as Justin Lumiere.  A true and correct copy of this e-mail is attached hereto as "Exhibit B."

123.    Upon information and belief, this e-mail was indeed sent by Justin Lumiere.

124.    Upon information and belief, the yahoo account "set-up" page requires that the creator of the account identify themselves, and Justin Lumiere typed his actual name as part of the account "set-up" process, not realizing that his name would be used in conjunction with the actual e-mail address he created for the purpose of taunting Mr. Shah, "ireallyreallyhatesachinshah@yahoo.com" – which he intended to be "anonymous" to the extent that Mr. Shah would not have direct proof that it was him harassing Mr. Shah.

125.    Further, upon information and belief, this e-mail was sent at 9:33 AM, ET, just after the start of trading (market open), and while Justin Lumiere was supposed to be working at his then place of employment, MKM Partners, LLC.

**Mr. Shah Finds it Difficult to Find a Job Due to Defendants' Malfeasance**

126.    From late Dec. 2012 to March 2013, Mr. Shah was interviewing for jobs.

127.    Several times throughout the process, Mr. Shah interacted with several people within the industry for an opportunity to interview and work for them, but the discussions suddenly hit a dead end, and Mr. Shah was never clear as to why.

128.    There were several instances where he would be extremely close to obtaining a position, even interviewing extensively with the heads of firms, when suddenly the conversations ceased, and Mr. Shah was told that he would not get the position, with little or no explanation.

129.    In at least two instances, it was at the very last stage in the candidate selection process, when the companies were in the final stages of their interviewing of Mr. Shah, and were checking references and doing their final due diligence concerning Mr. Shah, that the job prospect suddenly evaporated.

130.    Upon information and belief, Defendants, using their influence and contacts, were interfering with Mr. Shah's candidacy, and/or the reputational damage that Defendants had caused Mr. Shah, made him unable to obtain new employment with these firms.

**While Mr. Shah is Looking for a New Job, He Receives Another Threatening E-mail**

131.    On March 6, 2013, Justin Lumiere wrote Mr. Shah another e-mail that read as follows:

> Subject: Loser
> Hahaha…still no job….what's the matter….the big bloomberg tv personality can't get a job….oh yeah, that's right, its because your an asshole. [sic]
>
> That's why you keep getting fired from every job you ever had and no one likes you.  You will never get a job in this industry….payback is a bitch!

This e-mail was sent from a different yahoo mail account, "sachindaloser@yahoo.com," and this account has as its identifier "Sachin Daloser."  Upon information and belief, this is again Justin Lumiere, however, when creating this e-mail account, he did not create using his real name.  A true and correct copy of this e-mail is attached hereto as "Exhibit C."

132.    Upon information and belief, Mr. Lumiere, correcting for his last mistake, created this new yahoo e-mail account "sachindaloser@yahoo.com" leaving the "set-up" identifier for the account blank.

133.    Mr. Shah was extremely upset by both this e-mail, and the prior e-mail he had received from Justin Lumiere in January 2013.

134.    However, at this point, Mr. Shah had no idea just how far Justin Lumiere and the Defendants had already gone, and how far they were willing to go to further their retaliatory vendetta.

## Mr. Shah is Hired at Cuttone & Co. on March 21, 2013

135.    On March 21, 2013, Mr. Shah was finally able to gain a new job, with a family owned firm called Cuttone & Co., Inc.

136.    Mr. Shah was relieved he had been hired by Cuttone & Co., as now he could fully engage with his clients again, as he had been unable to provide his full services for them for several months.  He feared that any longer span of time would result in his clients becoming disenchanted, or impatient, with him.  The clients wanted to have Mr. Shah available to assist them with the research he was known for, which was to provide time-sensitive merger arbitrage and special situations analysis, commentary and emails from his distribution list.  The longer that Mr. Shah was unable to

19

give them the services they needed, the more likely the clients would go elsewhere and trade elsewhere.  In other words, Mr. Shah was facing a "shelf-life" issue, and was glad to be back in the marketplace.

137.    For example, in a television interview with BNN on 4/2/13, the television producers titled the segment "The Return of What's Shakin in M&A," where the television anchor specifically stated to Mr. Shah, "It is good to have you back."  It had only been a few months since Mr. Shah had left Tullett Prebon, and Mr. Shah's absence had been noted by the market-place, and it was extremely important for Mr. Shah to re-establish continuity of employment, both for his media presence, and for his client base.  Prior to losing his position at Tullett Prebon, Mr. Shah had been a "regular" on Canadian BNN, appearing on approximately a bi-weekly basis.

138.    Notably, Justin Lumiere is a direct competitor of Mr. Shah, as both are merger arbitrage and special situations analysts, and both cover special situations / arbitrage for clients.  The are only a limited number of persons who specialize in this particular area of trade strategies (specifically, those that have a level of sophistication and market recognition), and therefore, Mr. Shah was in direct competition with Justin Lumiere for the client base he had spent a decade or more cultivating.

139.    Indeed, upon information and belief, Justin Lumiere and the other Defendants may have also been improperly contacting Mr. Shah's clients directly, and seeking to steal them away to their own benefit.

140.    As per industry standard, within a few days of his new hire, Mr. Shah was again set up with a new Bloomberg Terminal, which indicated that he was now employed with Cuttone & Co. ("Cuttone").

141.    Mr. Shah began performing his services for his clients again, making media appearances and speaking to reporters, and generally undoing some of the damages that had been done by doing what he did best, his job.

**Only a Few Days After Ms. Shah Was Hired at Cuttone & Co., Justin Lumiere**
**Again Sent Multiple Defamatory E-Mails About Mr. Shah to his New Employers, However,**
**<u>This Time He Personally Identified Himself to Add Credibility to the Defamation</u>**

142.     Apparently, Justin Lumiere's e-mails in January and March of 2013 were not empty threats.

143.     Almost immediately after Mr. Shah's Bloomberg Terminal indicated to the industry that he had been employed by Cuttone & Co., most of the major principals at Mr. Shah's new employer received defamatory e-mails from Mr. Lumiere, and upon information and belief, such e-mails were either drafted by and/or sent in consort with Defendants, or aided and abetted by Defendants.

144.     On March 25, 2013, at 2:40 PM, Mr. Lumiere sent the following e-mail:

Subject: Sachin Shah

I noticed that you have recently hired Sachin Shah.

I find this very surprising since, to my knowledge, he was fired from basically every company he has ever worked at (Credit Suisse, Millennium, Capstone, Icap, Tullet, etc.).  I used to be his supervisor at ICAP and I can attest to this.  In addition, his activities have routinely been investigated by FINRA as well as the State Attorney General's Office. Further he routinely contacts Finra against the companies he currently worked at he learns he is going to get terminated for his incompetence in the hopes of protecting his job or forcing a settlement. [sic]

His activities with Bloomberg TV violate numerous securities laws particularly with his trading activities, along with his quotes to reporters. Since he engages in trading activities and provides information to traders.  In was this, along with his posting on message boards that led to the regulatory investigations, and ultimate dismissal from the various broker dealers.

I strongly suggest you contact those places again, as well as I'm sure he misled the circumstances regarding his departure from each place.  [sic]  In 10 years, he has had like 8 jobs all of which he has been fired from.  That should tell you something.

This e-mail was sent from Mr. Lumiere's personal e-mail account on yahoo, "justin_lumiere@yahoo.com." The false allegations that Defendants made were serious accusations, and immediately harmed Mr. Shah. They almost immediately prompted a call from Mr. Shah's new supervisor (and principal of Cuttone & Co.), Joseph Cuttone, only 17 minutes after it was sent. A true and correct copy of this e-mail is attached hereto as "Exhibit D."

145. Notably, Justin Lumiere accuses Mr. Shah in the March 25, 2013, 2:40 PM e-mail of the same malfeasance that Defendants were purported to be guilty of. Justin Lumiere specifically references (1) the exact items that Lester Levy was found guilty of and sanctioned by FINRA for his activities in 2008-2009 at ICAP ("his posting on message boards that led to the regulatory investigations"), and (2) the issues that Mr. Shah reported to FINRA were occurring between the Lumiere brothers in 2009 (the e-mail implies manipulation, front running, and improper trading - "he engages in trading activities and provides information to traders").

146. Justin Lumiere and Defendants are accusing Mr. Shah in these e-mails of exactly the same misconduct that Mr. Shah reported to regulators in 2009 at ICAP, that Defendants were engaging in, and what FINRA sanctioned Lester Levy for. Defendants' motivation here is clearly directly related to Mr. Shah's assistance to regulators. In the words of Justin Lumiere "**payback is a bitch**."

147. This e-mail is once again sent during the trading day by Justin Lumiere, which is disturbing as he should be managing his accounts and concentrating on his job, but took the time to contact Mr. Shah's employers directly.

148. This is significant because Justin Lumiere had no reason to contact Mr. Shah's employers directly, as if he truly had concerns, he should have contacted only the regulators (which upon information and belief, he also did), but he had absolutely no reason to try and directly interfere with Mr. Shah's employment, especially at the critical juncture when Mr. Shah was just getting new accounts "set up" to trade – so his clients could trade with Cuttone & Co. Further, Mr. Shah was just starting to "fit in" at a new job, working with his new Cuttone colleagues, and working with them to solicit new accounts. The disruption that the e-mails caused, which Justin Lumiere sent, was devastating.

**The Defamatory Allegations Contained in the March 25, 2013, 2:40 PM E-mail are False**

149. The accusations contained in the March 25, 2013, 2:40 PM e-mail are false.

150. Justin Lumiere states that Mr. Shah "…was fired from basically every company he has ever worked at (Credit Suisse, Millennium, Capstone, Icap, Tullet, etc.)." He also goes on to state that "I strongly suggest you contact those places again, as well as I'm sure he misled the

circumstances regarding his departure from each place. [sic] In 10 years, he has had like 8 jobs all of which he has been fired from. That should tell you something."

151.     Mr. Shah has not been fired from "every job he ever worked for," and certainly not for any securities violations.

152.     Justin Lumiere falsely implies that Mr. Shah was "fired from basically every company he has ever worked at" because he was engaging in improper activities that "violate numerous securities laws particularly with his trading activities, along with his quotes to reporters …he engages in trading activities and provides information to traders… alone with his posting on message boards…." He insinuates that Mr. Shah was terminated for securities law violations connected to the manner in which he does business, and that these activities were under investigation by FINRA and the "State Attorney General's Office."

153.     This is patently false, as, for example, Capstone's brokerage arm closed its doors for economic reasons, a publically known event. Therefore, Mr. Shah's loss of employment with Capstone had absolutely nothing to do with any securities law violation, rather, the entirety of Capstone's brokerage business closed down.

154.     Further, Mr. Shah's Form U-5s and FINRA (formerly the CRD) "broker-check" – or a type of "permanent record" for regulated persons in the securities industry, is "clean" – and he has never been terminated for any securities law violations. If Mr. Shah had been terminated because of securities law violations, or suspicion thereof, it would have to be reported by his prior employers, and reflected on both Mr. Shah's Form U-5s, and on his publically available "broker-check" record maintained by FINRA. (See e.g. Exhibit K, hereto, Mr. Shah's FINRA "broker-check.")

155.     Notably, as stated above, Mr. Shah was forced out of ICAP because the Lumiere brothers, Mr. Levy, and other ICAP colleagues, including ICAP supervisors, were protecting themselves and their own lucrative malfeasance, retaliating against Mr. Shah for cooperating with FINRA and the SEC, and trying to hide their own malfeasance (and/or now, apparently, shift blame to Mr. Shah for it).

156.     Further, this statement is additionally false, or false by implication, because of the insinuation that Mr. Shah lost his jobs at his prior employers, or was "fired" because he was *in fact* engaging in securities law violations. This is also false.

157.     This statement is additionally false because Justin Lumiere is falsely implying that Mr. Shah was under investigation and was "fired" from these jobs because he was under investigation by regulators.

158.     Mr. Shah is not aware of any *bone fide* or formal investigation by regulators into his business or trading activity, with the possible exception that Justin Lumiere and Defendants may themselves have caused FINRA to have an initial inquiry in response to Mr. Lumiere's defamatory e-mails to them (or, alternatively, FINRA became involved in an internal investigation by one of Shah's prior employers). However, upon information and belief, there never has been any formal "investigation" into Mr. Shah's activity, only Defendants' activity, and/or potentially inquiries brought about by Defendants' false allegations.

159.     Mr. Shah has never been questioned by any regulator in connection with any impropriety with **his** trading or other business activities, only with respect to providing information regarding Defendants' improper activity in 2009. Mr. Shah has not received any formal notification that he, himself, is under investigation by any regulator, nor has he received any requests for comment or information from any regulator. All he has done is cooperate in the investigation into ICAP in 2009, and in response to inquires by regulators into the defamatory e-mails by Defendants (where, notably, Defendants are the subject of the investigation, not Mr. Shah).

160.     Indeed, to the extent that it was true that Mr. Shah was "under investigation" – it was only because Defendants themselves *caused* an "investigation" by making false reports to FINRA and investigators (such as the Mass. AG's Office). Therefore, even if it is true that Mr. Shah was technically being "investigated" – it was because Defendants had falsely complained, and Defendants do not divulge that fact in these defamatory e-mails, leading to the false implication that the investigations were *bone fide*, and for legitimate regulatory concerns, when they were not.

161.     Mr. Shah has not engaged in any improper trading activity. Mr. Shah does not hold, or trade in, any of the securities that he researches, or provides coverage for.

162.     Mr. Shah has never actively traded in, or had any stake in the companies he provides coverage for.

163.     Indeed, Mr. Shah has not actively traded in years, and not in any of the securities for which he has had any coverage.

24

164.    Mr. Shah also only utilizes information that is publically available in providing his coverage of special situations / arbitrage.  Therefore, there is no insider information used in his coverage, and his analysis is based upon that which is available to the market at large.  Indeed, it mostly is drawn directly from a company's own financial statements (e.g. the research is predominantly derived from Form(s) 10-K or 8-K provided on PACER, filed with the SEC, or the company's own financial statements).

165.    Mr. Shah's coverage, therefore, is only the product of information that the *entire market-place already has*.  What Mr. Shah's clients value him for is his unbiased *appraisal* of these special situations, as well as the timeliness of his coverage.  Indeed, it is Mr. Shah's very neutrality, his experience, his understanding of the marketplace, and his ability to sift through all available information to locate critical facts, and synthesize it into a coherent message to his clients, which makes Mr. Shah valuable to his clients.  It also makes him someone that has an unbiased opinion that the market wishes to hear from on talk shows or media stories, and/or as part of the coverage or situational advice he can provide.

166.    At all times, Mr. Shah has maintained an appropriate "Chinese Wall" or "Fire-Wall" as the situation demanded.  He does not, and has not, engaged in the type of manipulation or front-running that Defendants were engaged in at ICAP, and that investigators sanctioned Lester Levy for.

167.    In addition, Mr. Shah does not get compensated directly as a result of his coverage of any particular event, arbitrage or security.

168.    Mr. Shah's clients use him so as to have access to his coverage of special situations / arbitrage in the aggregate.  They pay him for access to his broad coverage (Mr. Shah routinely covers more than 100 companies) and guidance, generally.  It is access to Mr. Shah's e-mail distribution list of commentary, analysis, trading ideas, guidance, and relevant "news-flow" that clients come to him for.

169.    This is entirely different than the situation that the Lumiere brothers were engaged in at ICAP, where Justin Lumiere was directly covering the same situations – in the same securities - that his brother at Visium was on the trading side ("buy" side) for.  In the situation at ICAP that Mr. Shah was concerned about, the potential for manipulation was high, and the potential impact for Justin Lumiere's "research" was direct and immediate for positions his brother, or his brother's firm

clients, held at Visium.  Further, unlike Mr. Shah who has worked closely and under the supervision of compliance at every firm since ICAP, Mr. Lumiere was the proverbial fox watching the chicken coup, as he was the supervisor of the desk, and his supervisor, Mr. Murphy, was sanctioned (albeit for impropriety on another desk) by the SEC for "failure to supervise" despite direct complaints of impropriety.

170.     Therefore, for Justin Lumiere to draw the analogy, and accuse Mr. Shah in these e-mails of impropriety for the very acts Defendants engaged in, is defamatory.

171.     Further, Mr. Shah does not receive any direct financial benefit from any particular strategy or coverage on a particular situation.  Clients compensate him, and utilize his services, in order to have access to his unbiased analysis, in the aggregate (on e.g. over 100 different securities in the special situations and merger arbitrage space), and based in part upon his analysis, his clients decide whether or not and how to trade in the securities in question.  His compensation is not linked to whether a security trades in any particular direction, or at all.

172.     Therefore, any allegation as to any impropriety in Mr. Shah's trading activity, or the manner in which he has provided or does provide commentary or analysis on publically available information, is false.

173.     Indeed, as a direct result of Defendants' campaign of defamation, Mr. Shah's business has been the subject of internal company scrutiny for several years.  He worked closely with compliance at Tullett Prebon, and other firms, and was careful, especially in light of the previously anonymous e-mails, that everything he did was reviewed and approved by compliance.

174.     Mr. Lumiere also falsely states and/or implies that Mr. Shah was "terminated" for "incompetence." ("I used to be his supervisor at ICAP and I can attest to this… he routinely contacts Finra against the companies he currently worked at he learns he is going to get terminated for his incompetence… [sic]").  This falsely states (or implies) that Mr. Shah was "terminated" for "incompetence."

175.      As stated above, Mr. Shah was not "terminated" by ICAP – but after he cooperated with regulators in February 2009, he was placed on inactive leave, or "garden leave," and his contract was not renewed.  This was not done because he was "incompetent" – indeed his notoriety and recognition by the marketplace as a commentator is a testament of the opposite.  As stated

26

above, Mr. Shah's contract was not renewed, in part, because Defendants were retaliating against him for his cooperation with regulators regarding Defendants' malfeasance, and because the entirety of ICAP was under scrutiny for a wide range of impropriety.

176.    Justin Lumiere additionally falsely states that Mr. Shah "routinely" contacted and contacts regulators when he feared he would be "terminated." ("I used to be his supervisor at ICAP and I can attest to this…Further he routinely contacts Finra against the companies he currently worked at he learns he is going to get terminated for his incompetence in the hopes of protecting his job or forcing a settlement. [sic]"). This is also false, or the factual implications it asks the reader to draw are false. Mr. Shah only went to regulators once, regarding Defendants at ICAP, when ICAP's internal compliance department did nothing to stop the illegal activity and conduct, and only then when it was apparent that Defendants were connecting their own impropriety with Mr. Shah's name on compromised research product, in part to utilize Mr. Shah's name to give their compromised and/or plagiarized research product credibility.

177.    What this comment also does, is falsely imply that Mr. Shah would bring the spotlight of regulators down upon any company that threatened to terminate him, so as to "force" a settlement.

178.    Mr. Shah has not engaged, and did not engage, in any such activity. Indeed, Mr. Shah has only gone to regulators twice in his career, once at ICAP in 2009, and now recently, in connection with the defamatory e-mail campaign by Defendants. However, for a new employer, this type of accusation, especially in the securities industry, is particularly troubling. (Dealing with a regulatory issue for any firm, especially for smaller firms like Cuttone & Co., is a costly and time consuming endeavor, and often requires significant legal costs and resources.)

179.    Defendant Justin Lumiere also falsely states that Mr. Shah's contact with reporters violates numerous securities laws. ("His activities with Bloomberg TV violate numerous securities laws particularly with his trading activities, along with his quotes to reporters.") This statement is false.

180.    As stated above, Mr. Shah's contact with reporters does not violate any securities law or regulation, and he had worked closely with compliance at many of his prior positions (apparently - in no small part due to defendants' defamatory campaign), to ensure as such.

181.     However, media contact is important for Mr. Shah to maintain his presence in the market-place.  Mr. Shah's livelihood is dependant in part upon his notoriety as an accurate and unbiased Special Situations / Merger Arbitrage Strategist.  He is able to, in essence, advertise his skills and coverage in this area, by maintaining a media presence.

182.     Upon information and belief, Defendant Justin Lumiere recognizes that the media presence is extremely important to Mr. Shah, and specifically recognizes this fact in his e-mails (**"Hahaha…still no job….what's the matter….the big bloomberg tv personality can't get a job….oh yeah, that's right, its because your[sic] an asshole"**).  Defendant Justin Lumiere in alleging that Mr. Shah is improperly using the media, is intentionally interfering with this aspect of Mr. Shah's job, as he knows it is critical to Mr. Shah's ability to earn a living.  Further, by coupling this false accusation with false allegations of market manipulation, he is hoping to force the new company, here Cuttone & Co., to engage in an expensive investigation to ensure that there is no risk that Mr. Shah's commentary in the public sphere is somehow violating securities laws.  It also is designed to force Cuttone & Co. to require that Mr. Shah get approval and/or cease commenting on matters until they are able to ascertain if such commentary is legal.  This investigation will, by its nature take time, and for Mr. Shah's (and Justin Lumiere's) particular specialty, *time sensitive* merger arbitrage or special situations strategies, it is a death blow, as it puts an unacceptable delay into providing information that clients deem to be extremely time sensitive.

183.     Finally, Justin Lumiere, by falsely accusing Mr. Shah of lying about his credentials, and/or the reasons for his leaving his prior employers ("I strongly suggest you contact those places again, as well as I'm sure he misled the circumstances regarding his departure from each place"), Justin Lumiere is causing Cuttone & Co. to contact all of Mr. Shah's prior employers, and repeat the defamatory comments to them, as well as generally create the maximum damage he can, by having Cuttone & Co. contact all of Mr. Shah's prior firms/employers and inquire as to Mr. Shah, all in the context of an investigation about securities violations.

**Justin Lumiere then Sends Another E-Mails to Cuttone & Co. at 5:44 PM**
**On 3/25/13, the Same Day, Further Defaming Mr. Shah**

184.     Justin Lumiere, not content with sending just this one e-mail, then apparently spoke to persons at Cuttone & Co., wherein he again continued to defame Mr. Shah.

28

185.    Upon information and belief, he had at least one phone conversation wherein he repeated the same defamatory statements to Mr. Cuttone on or about March 25, 2013.

186.    Justin Lumiere then followed-up his phone conversation with an e-mail on March 25, 2013, which attaches an e-mail Mr. Lumiere sent to Linda Freshman at the Mass. AG's Office on Nov. 13, 2012 (discussed above).  Mr. Lumiere states in this e-mail that "here is the State Attorney General of Massachusetts info who was looking into his illegal trading […] I will send you the finra/sec investigation info as well"  A true and correct copy of this e-mail is attached hereto as Exhibit E.

187.    This e-mail is also defamatory in that it again accuses Mr. Shah falsely of "illegal trading."  It also implies that there was an "investigation," that it was *bone fide*, and or was not created by or caused by Defendants' own false report(s).  This e-mail further implies that there is also a FINRA / SEC investigation into Mr. Shah, which is defamatory, or defamatory by implication, for the same reasons (stated above).

**Justin Lumiere then Sends Yet Another E-Mails to Cuttone & Co. at 5:55 PM**
**On 3/25/13, the Same Day, Further Defaming Mr. Shah**

188.    Justin Lumiere then sent Mr. Cuttone another defamatory e-mail, purporting to provide proof that FINRA had investigated or was investigating Mr. Shah for the impropriety Justin Lumiere was falsely accusing Mr. Shah of (as stated above).

189.    This e-mail was sent on or about March 25, 2013 at 5:55 PM, and a true and correct copy is attached hereto as "Exhibit F."  It states in relevant part as follows:

> From: Justin Lumiere
> Sent: Monday, March 25, 2013 5:55 PM
> To: Cuttone, Joseph
> Subject: Re: Sachin Shah
>
> here are the finra emails
>
> From: Ozag, Joseph <Joseph.Ozag@finra.org>
> Subject: Sachin Shah
> Date: Wednesday, September 15, 2010, 4:17 PM
>
> I am a director in FINRA's Office of Fraud Detection and Market Intelligence.  I would like to discuss this matter with you as soon as possible.

29

Please send me a telephone number on which you may be reached or call me at 240-386-6668. Thanks for your cooperation. I look forward to speaking with you soon.

Regards,

Joe Ozag

From: Darling, Sean <Sean.Darling@finra.org>

Subject: FINRA

Date: Monday, November 15, 2010, 8:57 PM

November 15, 2010

FINRA is currently reviewing the matter: Capstone Global Markets, LLC; ICAP Corporates LLC and Sachin Shah. As such, please contact the undersigned by November 29, 2010 if you are willing to cooperate with this review.

Please direct questions or comments regarding this matter to the undersigned at (212) 858-4494, sean.darling@finra.org.

Sincerely,

Sean M. Darling

Sean M. Darling

Associate Principal Examiner

FINRA

One Liberty Plaza

New York, NY 10006

212-858-4494

212-858-4041 (fax)

See Exhibit F (in relevant part)

190.     This e-mail by Justin Lumiere purports to attach evidence of an ongoing or prior FINRA investigation concerning Sachin Shah.

191.     This e-mail is false, as it implies that such investigation existed, when upon information and belief, there was no such investigation.

192.     If there was an investigation, it was not a *bona fide* investigation into actual improper activity or violation of the securities laws by Mr. Shah, but was instead the direct result of defendants making false and defamatory statements to investigators.

193.     Upon information and belief, this email has been altered and/or edited by Defendants, so as to add additional text and/or change the text within the portion of the e-mail that purports to be from investigators at FINRA.

30

194.    Upon information and belief, there is no investigation, enforcement proceeding, or other action entitled "Capstone Global Markets, LLC; ICAP Corporates LLC and Sachin Shah" concerning Mr. Shah.

195.    The e-mail is defamatory or defamatory by implication, as it creates the false impression that Mr. Shah was under investigation, or had been investigated by FINRA, for violating securities laws.

196.    This email also creates the false impression that Justin Lumiere had been contacted by investigators and then provided information in response, when upon information and belief, it was Defendants who initiated the contact, and were the cause of any inquiry by regulators, through their own false report and defamatory statements to investigators.

197.    Even if such an investigation had occurred, it never reached the point where Mr. Shah was asked for information, and Mr. Shah is unaware of any such investigation.  Therefore, given that the investigation was purportedly ongoing in or about 2010 (per Justin Lumiere's e-mail), it must have concluded by the time that Justin Lumiere sent the e-mail, and/or Mr. Shah was found to be innocent of any wrongdoing.

198.    Mr. Shah only learned of the existence of this purported "investigation" of him when he was forwarded this e-mail on or about April 8, 2013 (see below).

**Justin Lumiere then Sends Yet Another E-Mails to Cuttone & Co. at 6:35 PM On 3/25/13, the Same Day, Further Defaming Mr. Shah**

199.    Justin Lumiere then sent yet another e-mail to Mr. Cuttone, further defaming Mr. Shah.

200.    In an e-mail sent at 6:35 PM, ET, also on March 25, 2013, Justin Lumiere sent an e-mail with the following defamatory statement:

Re: Sachin Shah

I can also attest that he was fired from various entities, including ICAP and he then was the source for contacting FINRA against those entities in retaildion.  [sic]

As for his recent place at Tullet [sic] he was fired again for his suspicious trading activities and posting on message boards.

His going on Bloomberg TV and giving quotes to those in the media have been investigated since he trades on that information as well as allows clients to trade on it.

Again, his history of termination from employment at all the institutions Credit Suisse, Capstone, Millenium, ICAP, Tullet, etc. etc. should be further vetted by your firm as well as his regulatory investigations.  [sic]

A true and correct copy of this e-mail is attached hereto as "Exhibit G."

201.    Again, this e-mail is defamatory, in that it accuses Shah of "suspicious trading activities" and "posting on message boards."  For the reasons stated above, this e-mail is false and defamatory, as Mr. Shah was not engaged in *any* improper activity.  Rather, Mr. Lumiere appears to be accusing Mr. Shah of the same improper activities engaged in by Defendants at ICAP, that Mr. Shah complained of in 2009.  For example, Defendant Lester Levy was actually sanctioned, suspended, and fined by FINRA for, *inter alia*, illegal "posting on message boards," not Mr. Shah (See Exhibit A, hereto).

202.    This e-mail is additionally defamatory, in that it falsely states that Mr. Shah was fired from "Tullet [sic] Prebon" for these "suspicious trading activities" and "posting on message boards." This is patently false.  Mr. Shah's Form U-5 and FINRA regulated "broker-check" would have to reflect such a termination as being for securities violations, or potential securities violations, and it does not.

203.    Justin Lumiere also, banking on his being Mr. Shah's supervisor, defames Mr. Shah by stating that he can "attest" to the fact that Mr. Shah was "fired" from "various entities, including ICAP," and "then was the source for contacting FINRA against those entities in retaliation."  This is false.

204.    With respect to ICAP, Mr. Shah contacted regulators in February of 2009 in response to Defendants' use of his name on compromised research reports, and only after ICAP's repeated failure to take any internal corrective action.  (ICAP's internal compliance was sanctioned the same year for, *inter alia*, failure to supervise).  Mr. Shah cooperated with regulators (ultimately leading to the sanction of Mr. Levy - and only in part to the overall inquiry by regulators into ICAP's various activities – notably – some of which had nothing to do with Mr. Shah or any area of his involvement at ICAP).  However, it was months after Mr. Shah's contact with regulators started that he was put

on garden leave, and his contract was allowed to expire in August of 2009. He was never fired, and ICAP's own Filed U-5, and FINRA's brokercheck, do not indicate any termination for any issues related to violations of securities laws (which would be required if true).

205.    The additional implication here, is that Mr. Shah is a troublemaker, and a whistleblower, that runs to regulators to leverage his employers into settlement (or in "retaliation"), and prevent them from terminating him (according to Justin Lumiere's other e-mails, presumably for either incompetence or regulatory violations). This is additionally false, and/or defamation by implication.

206.    Justin Lumiere is not in a position to "attest" to any fact that Mr. Shah was fired from entities other than ICAP. He similarly is not in a position to know any "source" for contacting regulators in "retaliation" for Mr. Shah's purported "firing" from entities other than ICAP. Mr. Lumiere only worked with Mr. Shah at ICAP, and certainly did not have access to any investigation by regulators. This statement is patently false, and was designed, again, to cause the maximum harm to Mr. Shah, who had only just stated working for Cuttone & Co., and was at the critical phase of getting more of his clients to open new trading accounts after months out of work, and start getting compensated for his work at Cuttone & Co.

207.    Again, in this e-mail Justin Lumiere also falsely states that Mr. Shah's contact with the press was somehow improper, and that Mr. Shah is actively trading to his own advantage ("His going on Bloomberg TV and giving quotes to those in the media have been investigated since he trades on that information as well as allows clients to trade on it").

208.    Again, there is nothing wrong with Mr. Shah's comments to the press (as noted above), and the allegations in the e-mail to the contrary are false and defamatory. Mr. Shah does not actively trade, and does not take positions in the securities, special situations, or anything that he covers, and the allegations in the e-mail to the contrary, and/or that Mr. Shah is somehow (or his clients are somehow), improperly trading in conjunction with the comments to the press are false and defamatory.

209.    Mr. Shah's clients are utilizing his unbiased and independent coverage and strategy in order to make informed trading decisions. Nothing is improper in the manner in which they choose to trade upon Mr. Shah's coverage. (Notably, that is the point of providing strategy, to allow for

clients to make informed decisions regarding their trading). There is no insider information present in the coverage. The coverage Mr. Shah provides is unbiased, and comes from publically available sources. The particular findings of Mr. Shah's are not tied to his compensation, and clients use him for access to the coverage (globally – on over 100 securities at any one time).

210.     However, the mere act of investigating these issues, and dealing with Justin Lumiere's threatened potential regulatory inquiry, was a costly endeavor for Cuttone & Co.

211.     Further, in the securities industry, if you are on "notice" regarding a potential impropriety, it heightens the change that a firm will be held accountable for the acts of its employees, a fact certainly know to Defendants, including Lester Levy, an attorney. Defendants, by "tipping" or giving Cuttone & Co. a warning that Mr. Shah might be violating securities laws, purposely created a situation where any potential future issue involving Mr. Shah would be likely considered a potential liability for the firm as a whole, as they were now made "aware" of it. This could potentially subject the firm to regulatory action for, *inter alia*, failure to supervise. In short, Justin Lumiere and Defendants, by making these false allegations, made it harder and more expensive to employ Mr. Shah, and the firm knew that if anything did go wrong in the future, these "tips" could be the basis for regulators to say that the firm was on notice, but did not sufficiently take steps to prevent the activity. Since Justin Lumiere effectively complained about every aspect of Mr. Shah's job, anything that Mr. Shah subsequently did would be held to this higher standard. Defendants knew full well that in the risk adverse, post-ENRON climate, of the securities industry, allegations that put Cuttone & Co. "on notice," with associated increased regulatory risk, was particularly damaging to Plaintiff. Upon information and belief, this was the intent of Defendants.

**Justin Lumiere Sends Another E-Mail to Cuttone & Co. on April 1, 2013, Now Not Only Threatening Shah, But Also Threatening Cutton & Co.**

212.     Defendants' actions and Justin Lumiere's e-mails were having the desired effect, as they were interfering with Mr. Shah's new employment.

213.     Mr. Shah was being internally investigated by Cuttone & Co., and his activities were being closely monitored.

214.     Mr. Shah also had to suffer the additional problems and reputational damage associated with having all of his prior employers, and FINRA, contacted by Cuttone, so they could

34

investigate the false and defamatory statements, and ascertain if there was any proof to Justin Lumiere's far reaching and defamatory statements.

215.   Upon information and belief, the investigation for Cuttone & Co. was an extremely costly undertaking.  Upon information and belief, they had by this point incurred significant legal fees, and had to devote time and resources in conducting the investigation (perhaps representing costs and expenses in excess of $20,000).  Therefore, Justin Lumiere was making it extremely costly for Cuttone & Co. to continue to employ Mr. Shah and investigate the false allegations.

216.   However, despite Mr. Lumiere's initial salvo of e-mails on 3/25/13, for anyone looking on Bloomberg, Mr. Shah's Bloomberg Terminal indicated that he was still employed, and he was opening and bringing his clients to Cuttone & Co., as well as working to prospecting new clients for Cuttone & Co.

217.   This apparently prompted Justin Lumiere to additionally threaten Cuttone & Co., and further defame Mr. Shah, in the hopes of getting Mr. Shah's employment terminated.

218.   On April 1, 2013, at 7:16 AM, Justin Lumiere sent Joseph Cuttone, Mr. Shah's boss, another defamatory e-mail, forwarding his previous March 25, 2013, 6:35 PM E-mail (attached above), that now additionally threatened that Justin Lumiere would get Cuttone & Co. "investigated" by regulators, unless Cuttone "terminated" Mr. Shah.

> Re: Sachin Shah
>
> Just so you know, unless he is terminated by your firm for his lying on his U-4 and on his resume and other false statements he made to you, I will contact various securities regulators which will in turn get your firm investigated.

A true and correct copy of this e-mail is attached hereto as "Exhibit H."

219.   Here, Justin Lumiere and Defendants further defamed Mr. Shah by falsely stating that he was "lying on his U-4," which is a form that is required to be accurate under FINRA rules, and therefore accuses Mr. Shah of another crime.  In addition, the e-mail falsely accuses Mr. Shah of lying on his resume and "other false statements he made to you."  Mr. Shah did not make false statement or "lie" on his resume, Form U-4, or at any point to Cuttone & Co.

220.   This e-mail is also patently false, as Justin Lumiere would have no access to either the Forms U-4 and U-5 filed (the required form that each firm must file containing information

regarding hiring (from U-4) and termination of employment (Form U-5) in the securities industry), as only the prior employers and regulators had access to those forms.

221.    Justin Lumiere would similarly have no access to Mr. Shah's resume, or job application, at any firm other than ICAP.

222.    However, this e-mail was now directly threatening Cuttone & Co. with more costly "investigations" and putting Cuttone & Co. under a regulatory spotlight.  Further, since Justin Lumiere was working at one firm (MKM), his brother was working at Visium, and his other family members were also working at Visium, their name had some weight in the market-place.  Therefore, the effect was to further interfere with Cuttone & Co's contract of employment with Mr. Shah, and further disrupt and damage Mr. Shah's career.

**On April 8, 2013, Justin Lumiere Sends Another Defamatory E-Mail to Mr. Cuttone Regarding Mr. Shah**

223.    Justin Lumiere, apparently dissatisfied that he had not yet succeeded in getting Mr. Shah terminated from Cuttone & Company, sent another e-mail to two persons at FINRA (or at least purportedly at FINRA, and copied Mr. Cuttone, further defaming Mr. Shah.  The e-mail states as follows:

> From: Justin Lumiere
> Sent: Monday, April 08, 2013 12:21 PM
> To: joseph.ozag@finra.org; sean.darling@finra.org
> Cc: Cuttone, Joseph
> Subject: Sachin Shah - Cuttone
>
> Previously, Finra had investigated Sachin Shah in connection with his alleged violations of Finra rules.  In addition, an investigation was also launched by the State Attorney General's Office of the State of Massachussetts.  Since those investigations launched, Mr. Shah has been terminated from his last three places of employment - ICAP, Capstone and Tullett Prebon.  Indeed, Tullett had found he violated company compliance policies by posting on his analysis on message boards.
>
> Despite the fact that he has been terminated from at least 6 different firms (Credit Suisse, Millenium, and others), he falsifies his U-4 to get hired by firms.  I have learned that he is now working with the firm Cuttone.
>
> As with the others, he continues to engage in actions in violations of Finra rules.  For example, just the other day, he contacted clients at the firm to trade shares in the company Obagi, citing how it was involved in a merger arbitrage strategy.  Despite

36

the fact the advised the clients to trade in those shares he then makes statements in the public through Bloomberg News that he feels the price for Obagi could increase due to a bidding war. As a result, the clients he advised previously have benefited by the shares increasing through his public statements, and which he and his firm personally benefits from as well.

In addition, he makes no mention in his Bloomberg statements that he and his firm has a personal interest, thereby violating public statements rules of Finra as well.

I have advised the Cuttone compliance and senior management people of this, but they have disregarded my warnings and have turned a blind eye to Mr.Shahs' illegal trading and front running activities.

As such, I strongly suggest, just as with the other times, that another investigation be launched in Mr. Shah's actions.

A true and correct copy of the April 8, 2013 e-mail is attached hereto as "Exhibit I."

224.    Justin Lumiere again presents his litany of false and defamatory accusations, which are false for the reasons present above, e.g. inter alia, Mr. Shah has not engaged in actions in violation of FINRA rules, he does not actively trade nor take positions in securities he covers (he has no "personal interest"), his compensation is not linked to a particular stock's movement, Mr. Shah has not falsified his Form U-4, Mr. Shah is not engaged in illegal or improper trading, Mr. Shah is not engaged in "front running," and there were no prior bone fide investigations "launched" into Mr. Shah's actions (except, perhaps, in response to Defendants' own false reports).

225.    Indeed, this e-mail seems to imply violations that would only make sense if Mr. Shah was, in effect, doing what the Lumiere brothers did at ICAP in 2007-2009, where one brother leaked compromised research at ICAP, and the other brother traded on the buy side at Visium in the same securities and special situations / merger arbitrage that was covered by the research at ICAP. In that situation, the Lumiere brothers did, in fact, directly benefit from a particular movement of stock, or what was contained in the research (or leaked). In contrast, Mr. Shah did not have any "stake" in the securities he covered, and did not get compensated for anything other than his clients' trading with him, so they could have access to his research generally, and therefore, Shah did not benefit from any particular security being covered, or movement therein, as Justin Lumiere falsely alleges.

37

226.     Again, this false and defamatory e-mail is designed to harm Mr. Shah in his professional capacity, and accuses him of crime(s).

227.     Further, this false and defamatory e-mail is specifically designed to maximize the damage to Mr. Shah's career, as it was coped to his employers, and coupled with the prior threats, he is effectively trying to initiate a FINRA investigation, which he knows will be costly and time consuming for Cuttone & Co. to deal with.  It is also harassing to Mr. Cuttone and his firm.

228.     In addition, Justin Lumiere is knowingly attempting to initiate, or "launch" an investigation into Mr. Shah regarding allegations that he knows, or should reasonably know, to be false.

229.     Justin Lumiere and Defendants are acting out of malice in sending this (and the other e-mails contained herein).

230.     This e-mail constitutes a false report to FINRA, a self regulating entity empowered by the SEC to regulate the securities industry, and therefore, is the equivalent of a false report to a law enforcement officer.

231.     On or about April 8, 2013, Joe Cuttone provided Mr. Shah with copies of the e-mails that he had received from Justin Lumiere (the three e-mails on 3/25/13, the e-mail on 4/1/13, and the e-mail on 4/8/13), that are attached hereto (these e-mails are actually attached only in part, as they have been redacted to remove the transmittal communications with Mr. Cuttone and/or attorney-client communications between Mr. Shah and his counsel).  It was not until this point that Mr. Shah was able to see the string of e-mails that had been sent to Cuttone & Co., as well as the forwarded e-mails from prior defamatory e-mails, that Mr. Shah learned of the specific e-mails, and began to see the full extent of Defendants' vendetta against him.

**As a Result of the Defendants' Defamatory Campaign, Mr. Shah is Terminated from Cuttone**

232.     On or about April 10, 2013, Cuttone & Co., two days after Justin Lumiere copied Cuttone & Co. on the April 8, 2013 e-mail that was sent to FINRA (or purportedly was sent to FINRA), and as a direct result of the malicious defamation campaign of Defendants, Cuttone & Co. decided to terminate Mr. Shah's employment.

233.     Mr. Shah was given the opportunity to resign, refused, and was ultimately terminated.

234.     Mr. Shah was unable to service his clients, and was placed in a very vulnerable position, as he had been asking his clients to open new trading accounts with Cuttone & Co., and thereby "bring his book of business" to Cuttone & Co.  Opening an account is not a simple process, and is time consuming for a client.  Mr. Shah had just asked all his clients, many of whom he had been working with at Tullett Prebon, to work with him at Cuttone.  Now, they were with Cuttone, or in the process of opening a new trading account with Cuttone, and Mr. Shah was suddenly let go from Cuttone & Co.

235.     This type of uncertainty and disruption, besides being a nuisance and cost to clients, is also damaging in that it creates an impression that Mr. Shah is unreliable, and/or has actually done something wrong to deserve a swift termination and/or cessation of employment or association with a firm.

236.     In the termination process, Cuttone & Co. told Mr. Shah that in order for him to be employable in the future, he had to "take care" of the problem, and address and stop Defendants' malicious acts.

237.     Mr. Shah will be unable to gain new employment until he can stop Defendants from their defamatory activity, and until and such time as they are prevented from contacting prospective or actual new employers and engaging in the same misconduct that Defendants have apparently been engaging in since 2009.

**Defendant Justin Lumiere Sends Mr. Shah a Final E-mail Gloating That He Got Mr. Shah "Fired" and Threatening to Continue the Same Defamatory Conduct In Retaliation for Mr. Shah's Assistance to Regulators in 2009**

238.     As a result of Mr. Shah's termination of employment on or about April 10, 2013, his Bloomberg Terminal account was changed to a "transitional" account on Friday, April 11, 2013, which made it apparent to anyone else with a Bloomberg Terminal that Mr. Shah's employment with Cuttone had been terminated.

239.     Anyone with a Bloomberg Terminal could see the change in employment, including Mr. Shah's clients and Defendants.

240.     Notably, by April 11, 2013, Justin Lumiere had lost his employment with MKM Partners LLC, however he did have a transitional Bloomberg Terminal account.

241.     Both Defendants Stefan Lumiere and Lester Levy did have Bloomberg Terminal Access.

242.     Although Stefan Lumiere also lost his job in or about the week of April 29, 2013, upon information and belief, he also had access to a Bloomberg Terminal, and/or did for all times relevant to this complaint.

243.     Almost immediately following Sachin Shah's Bloomberg Terminal Change (at 3:56 PM on April 11, 2013), an e-mail was sent by Defendants, from Justin Lumiere's "sachindaloser@yahoo.com" e-mail account, to Mr. Shah's e-mail account, and forwarding his prior March 6, 2013 e-mail (discussed above), stating the following:

> Subject: Re: Loser
>
> I just got you fired from Cuttone….i told you…i will follow you to the ends of this earth to make your life as miserable as you made mine and everyone else's
>
> Payback is a bitch….you have no one to blame but yourself for this.

A true and correct copy of this e-mail, including a printout of "metadata" associated with the transmittal of this e-mail, is attached hereto as "Exhibit J."

244.     This, and the prior e-mails, show the clear intent, malice, and retaliatory intent behind Defendant's defamatory campaign, tortious interference, and malicious prosecution of Mr. Shah.

245.     The references to "payback" and "make your life as miserable as you made mine and everyone else's" are clear references to Mr. Shah's lawful report and assistance to regulators in 2009, and how it exposed and/or interrupted Defendants' lucrative and improper activities at ICAP.

246.     Justin Lumiere clearly references that he is not acting alone, and was engaging in these defamatory and retaliatory acts in furtherance of his, his brother Stefan Lumiere's, and Mr. Levy's, interests, and in retaliation for Mr. Shah's assistance to regulators in exposing Defendants' improper misconduct at ICAP.

247.     Defendant Justin Lumiere makes a clear admission, that "I just got you fired from Cuttone…"

248.     Further, Defendant Justin Lumiere makes it clear that he will continue to engage in the same misconduct. (e.g. "….i told you…i will follow you to the ends of this earth to make your life as miserable as you made mine and everyone else's," Exhibit I; "You are done in this

industry....i will make it my mission in life to make sure you keep getting fired from jobs," Exhibit B).

249.     Upon information and belief, Defendant Justin Lumiere and the other Defendants will continue to act affirmatively to harm Mr. Shah, and prevent him from acquiring new employment.

**Mr. Shah has a "Clean" Regulatory Record**

250.     Mr. Shah has not been terminated from any employment due to any securities law violations.

251.     Mr. Shah has a "clean" record with FINRA.

252.     Attached hereto is a true and correct copy of Mr. Shah's current FINRA BrokerCheck Summary, and "Detailed Report," indicating that there are "No" disclosure events associated with Mr. Shah  (Attached hereto as Exhibit K).

253.     Disclosure events are "certain criminal matters; regulatory actions; civil judicial proceedings; customer complaints; arbitrations, civil litigations; and financial matters in which the broker has been involved."

254.     If Mr. Shah had committed and been found guilty of securities law violations or other malfeasance by FINRA, or if Mr. Shah was terminated from employment due to such violations, as was alleged by Defendants, it would appear on Mr. Shah's FINRA Broker-Check record, which functions as a kind of "permanent record," and is designed, in part, to alert the public.

**Punitive Damage Are Warranted**

255.     As the foregoing demonstrates, Defendants' conduct toward Plaintiff was willful, egregious, reckless and unlawful and caused Plaintiff substantial economic harm. Defendants have engaged in misconduct that involved making false statements to regulators and/or law enforcement officials, and did so in retribution for Plaintiff's assistance to regulators in 2009 in uncovering Defendants' misconduct. Defendant's malice is patent, as the attached e-mails, and the prolonged vendetta against Mr. Shah, demonstrate. As a result of Defendants' malicious conduct, Defendants are liable to Plaintiff for punitive damages.

256.     Punitive damages are also warranted in that they will further the public policy of New York. Punitive damages will deter similar misconduct and be exemplary to others who might be tempted to engage in the same abusive, retaliatory, and tortuous misconduct in retaliation against

persons, like Mr. Shah, who assist regulators in reporting malfeasance to the SEC or FINRA. Punitive damages will also serve public policy, as they will deter similar misconduct whereby persons make false and defamatory reports to FINRA or the SEC.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Defamation / Defamation by Implication)

257.   Plaintiff repeats and realleges each and every allegation contained in this Complaint, as if set forth fully herein.

258.   Defendants made false statements of fact about the plaintiff.

259.   These statements include but are not limited to the statements in the following e-mails and defamatory statements:

    a.   The December 2009 "Anonymous" e-mail(s), sent to Mr. Shah's employers at Capstone (described above);

    b.   Any statements or e-mails made in connection to the e-mails to or from FINRA on or about Wednesday, September 15, 2010, 4:17 PM, or November 15, 2010, 8:57 PM (the purported e-mail communications with FINRA contained in the March 25, 2013 e-mail to Cuttone, attached as Exhibit F).  Such statements are believed to falsely report or accuse Mr. Shah of a crime, namely securities violations, including the manner in which he conducts his business, provides commentary to the press, falsely accusing him of "illegal trading" and/or of improperly profiting from his providing strategy to his clients, and/or the other allegations contained above.

    c.   The July 2011 "Anonymous" e-mail(s), sent to Mr. Shah's employers at Tullett Prebon, and to FINRA (described above);

    d.   The November 2012 e-mail(s) (and/or statements) sent to regulators (Mass. AG's Office) (descried above), connected with the November 13, 2012 9:14 AM e-mail from Lynda Freshman, Off. of the Attorney General (Mass.) (attached hereto as "Exhibit E").  Such statements are believed to falsely report or accuse Mr. Shah of a crime, namely securities violations, including the manner in which he conducts his business, provides commentary to the press, falsely accusing him of "illegal trading"

and/or of improperly profiting from his providing strategy to his clients, and/or the
other allegations contained above;

e.   Any statements or e-mails sent on or about November 2012 – December 2012 e-
mail(s) sent and/or forwarded to Tullett Prebon (regarding the Mass AG's Office e-
mail) (See Exhibit E), or the Wednesday, September 15, 2010, 4:17 PM, or
November 15, 2010, 8:57 PM (the purported e-mail communications with FINRA
contained in the March 25, 2013 e-mail to Cuttone, attached as Exhibit F);

f.   The 1st March 25, 2013 e-mail sent to Cuttone (attached hereto as Exhibit D)

g.   The 2nd March 25, 2013 e-mail sent to Cuttone (attached hereto as Exhibit E)

h.   The 3rd March 25, 2013 e-mail sent to Cuttone (attached hereto as Exhibit F)

i.   The 4th March 25, 2013 e-mail sent to Cuttone (attached hereto as Exhibit G)

j.   The April 1, 2013 e-mail sent to Cuttone (attached hereto as Exhibit H)

k.   The April 8, 2013 e-mail sent to FINRA and copied to Cuttone (attached hereto as
Exhibit I).

l.   Similar e-mails that may yet be discovered but were concealed by Defendants' own
act(s) in furtherance of concealing their identities, and Defendants' purposely
cloaking the defamatory communications as a "regulatory tip" or "whistle-blowing" –
so as to try and prevent Mr. Shah from discovering the defamatory statements.

m.   Statements by Defendants believed to be made to prospective employers of Shah in
January through March of 2013;

n.   Any other statements by Defendants, whereas the defamatory allegations made in the
e-mails attached at Exhibits D, E, F, G, H, or I are repeated.

260.   These statements were published to third parties without authorization or privilege.
The e-mails (attached hereto) were published the recipients, and courtesy copied to other recipients.
In addition, Defendants intended to initiate an investigation into their false statements, and cause re-
publication to other person(s) at Plaintiff's employers.   Further, Defendants intended to have the
defamatory statements republished to all or Mr. Shah's prior employers (as alleged above), as well as
to regulators, as the recipients would, necessarily, investigate the false allegations.   Therefore, these

43

defamatory statements were published widely to Mr. Shah's then employers, past employers, regulators, and any persons involved in "investigating" the false allegations.

261.    The publication was made intentionally, with malice, or at the minimum, negligence or gross negligence on the part of Defendants.

262.    Defendants made these statements with actual malice and knowledge of their falsity, which is evinced by *inter alia*, (1) their motivation concerning Mr. Shah's exposure of their improper activities at ICAP, (2) Mr. Lumiere's statements in the January 7, 2013 e-mail (Exhibit B), (3) Mr. Lumiere's statements in the March 6, 2013 e-mail (Exhibit C), and/or Justin Lumiere's April 11, 2013 e-mail confirming his malicious intent (Exhibit J).

263.    The defamatory statements constitute defamation *per se*, as the statements accused plaintiff of a serious crime (such as violations of securities laws, rules and regulations); tended to injure him in his trade, business, or profession; and were so severe that serious in-jury to the plaintiff's reputation can be presumed.

264.    The defamatory statements caused Plaintiff special damages, including but not limited to (1) the loss of his jobs at Tullett Prebon and Cuttone, (2) while he was employed, his being subjected to internal company investigations and increased scrutiny which hampered his ability to service his clients and earn income, (3) after the loss of his job, the inability to service his client base (or book of business), and associated loss of income, (4) the loss of some or all of his book of business, as certain of these clients will start working with other persons who provide the same or similar services, and (5) the loss of future income, as due to the campaign of defamation and continuing acts of Defendants, it is all but impossible for Mr. Shah to get new employment.

265.    If the statements themselves were not defamatory, they are defamatory by implication as they involve false suggestions, impressions and implications arising from otherwise truthful statements.  Therefore, if Defendants themselves caused there to be an actual investigation by FINRA, the SEC or other regulatory or law enforcement officials (Such as the Mass. AG's Office), through their own false report, it may have been technically true that an investigation was launched into Mr. Shah (due to Defendant's own misconduct and false report), but the statements are nonetheless defamatory by implication, here implying that said investigations were *bone fide* and the result of Mr. Shah being engaged in actual impropriety or securities law violations.

266.     Mr. Shah was damaged and seeks compensation for damage to his reputation (including for per-se defamation), compensatory damages, including suffered pain and suffering, increased stress, trauma, and emotional harm, special damages, punitive damages, damages associated with his loss of business / client book, interest costs and attorney's fees, in an amount to be determined at trial, but no less than $5,000,000.00.

267.

### AS AND FOR A SECOND CAUSE OF ACTION
#### (Tortious Interference with Contract)

268.     Plaintiff repeats and realleges each and every allegation contained in this Complaint, as if set forth fully herein.

269.     Defendants have intentionally and tortiously interfered with the contractual relationships Mr. Shah had with Tullett Prebon.

270.     Mr. Shah had a valid contract of employment with Tullett Prebon.

271.     Defendants knew of Mr. Shah's employment contract, through, inter alia, their Bloomberg Terminals.

272.     Defendants intentionally sought and achieved a breach of the employment contract (diminishment of Mr. Shah's salary, denial of a bonus, and ultimately the termination of Mr. Shah's employment) through their defamatory e-mails to Tullett Prebon in or about the summer of 2011, and in November and December 2012 (*inter alia* accusing Plaintiff of improprieties, securities fraud, lying on his U-4 etc.), and their acts in creating, or creating the appearance of, investigations into Plaintiff by their false reports to regulators, and/or their false reports to Tullett Prebon.

273.     Defendants had no justification for their acts, indeed they acted with actual malice.

274.     As a direct result of Defendants' intentional conduct and interference, Mr. Shah lost his employment with Tullett Prebon, and suffered through internal investigations that further defamed him and damaged his career.

275.     Mr. Shah has suffered damages as a result of Defendants' tortious interference with Mr. Shah's contract with Tullett Prebon.

276.     Defendants have also intentionally and tortiously interfered with the contractual relationships Mr. Shah had with Cuttone.

277.    Mr. Shah had a valid contract of employment with Cuttone.

278.    Defendants knew of Mr. Shah's employment contract, through, inter alia, their Bloomberg Terminals.

279.    Defendants intentionally sought and achieved a breach of the employment contract *inter alia* through their defamatory e-mails to Cuttone, attached hereto (*inter alia* accusing Plaintiff of improprieties, securities fraud, lying on his U-4 etc.).

280.    Defendants had no justification for their acts, indeed they acted with actual malice.

281.    Defendant Justin Lumiere, by his own e-mail of April 11, 2013, literally confesses to the tort. (See Exhibit J) ("I just got you fired from Cuttone....i told you....i will follow you to the ends of the earth to make your life as miserable as you have made mine and everyone else's. payback is a bitch....you have no one to blame but yourself for this.")

282.    As a direct result of Defendants' intentional conduct and interference, Mr. Shah lost his employment with Cuttone, and suffered through internal investigations that further defamed him and damaged his career.

283.    Mr. Shah has suffered damages as a result of Defendants' tortious interference with contract, including but not limited to the loss of the benefit of the contracts, including lost compensation, the value of his ongoing employment with Tullett and/or Cuttone, diminishment of the value of his book of business, lost future profits, compensatory damages, punitive damages, interest, cost, and reasonable attorney's fees.

284.    Mr. Shah has been damaged, in an amount to be determined at trial, but no less than $5,000,000.

### AND AS FOR A THIRD CAUSE OF ACTION
### (Tortious Interference with Prospective Economic Advantage / Business Relations)

285.    Plaintiff repeats and realleges each and every allegation contained in this Complaint, as if set forth fully herein.

286.    Defendants have intentionally and tortiously interfered with the Plaintiff's prospective business relations.

287.    Mr. Shah had a business relationship with his clients, whereby he would give them access to his coverage and strategy (as described more fully above), and in return, they would trade with Mr. Shah and at the firm where he was employed.

288.    By interfering with Mr. Shah's jobs at Tullett Prebon, and Cuttone & Co., and his future job prospects, and defaming his good name (including raising the specter of regulatory inquiry, securities law violations, and impropriety), Mr. Shah has lost his jobs with a regulated firm, and has been unable to provide his full services to his clients (his book of business) since December of 2012.  Further, his book of business is losing its value, as clients are becoming concerned and disenchanted with Mr. Shah, and his inability to provide his services, leading to them going elsewhere to conduct business.

289.    Defendants knew of this business relationship between Mr. Shah and his clients, and intentionally interfered with it.

290.    Defendants interference did in fact cause injury to Mr. Shah's client relationships.

291.    Defendants acted solely out of malice, and/or used improper or illegal means that amounted to a crime or independent tort (including but not limited to Defendants' malicious motivation concerning Mr. Shah's exposure of their improper activities at ICAP, Mr. Lumiere's statements in the January 7, 2013 and March 6, 2013 e-mail (Exhibits B and C), Justin Lumiere's April 11, 2013 e-mail confirming his malicious intent (Exhibit J), and/or the other acts complained of herein, including but not limited to improper, defamatory or illegal false reports to regulators, improper and defamatory statements to Mr. Shah's employers, and upon information and belief, statements that may have been made by Defendants directly to Mr. Shah's clients.

292.    As a direct result of Defendants' intentional conduct and interference, Mr. Shah has lost his current employment, and therefore cannot service his client's needs.  Clients are unable to conduct business with Mr. Shah, and he cannot be compensated for research product until he becomes associated with a registered firm.  Mr. Shah has been unable to be compensated for the services he provides his clients since December of 2012.

293.    Furthermore, Mr. Shah's business is driven in many respects by his reputation and television appearances.  Due to Defendant's misconduct, Mr. Shah is not affiliated with any

regulated entity, and cannot appear on the same television shows that he previously did.  This will continue to harm Mr. Shah into the future.

294.    Defendants actions also caused tortuous interference with Mr. Shah's prospective economic advantage associated with the income he would have been able to derive from his book of business had Defendants not engaged in their wrongful misconduct.  The value of Mr. Shah's client list (or book of business) is diminishing as time passes, and clients may never return.

295.    As a result of Defendants' tortious interference with Plaintiff's prospective economic advantage, Plaintiff has suffered substantial economic harm and is entitled to compensatory and punitive damages, including but not limited to compensation for past and future damages associated with loss of business and prospective business (future damages) for the decrease in value of his book of business.

## AND AS FOR A FOURTH CAUSE OF ACTION
### (Malicious Prosecution)

296.    Plaintiff repeats and realleges each and every allegation contained in this Complaint, as if set forth fully herein.

297.    To the extent that the e-mail(s) from FINRA forwarded to Cuttone are accurate, and not themselves fraudulent, Defendants caused the initiation of or continuation of a proceeding, entitled "Capstone Global Markets, LLC; ICAP Corporates LLC and Sachin Shah." (See Exhibit F).

298.    Upon information and belief, Defendants lacked any probable cause to make their "tips" or false reports to regulators at FINRA, and made false statements in furtherance of either initiating or continuing that proceedings, or failed to make a full, truthful and complete statemtns of the facts, and did so full knowledge of the falsity of their statements.

299.    Defendants acted with actual malice (evinced by *inter alia* Defendants' malicious motivation concerning Mr. Shah's exposure of their improper activities at ICAP, Mr. Lumiere's statements in the January 7, 2013, March 6, 2013, and April 11, 2013 e-mails (Exhibits B, C and J, respectively).

300.    Although Defendants' actions were malicious, in the alternative, they were at the minimum reckless and/or grossly negligent.

48

301.    Upon information and belief, the FINRA proceeding found Mr. Shah innocent of any wrongdoing, as evinced by his "clean" broker-check (Exhibit K). Therefore, there was a termination of the proceeding in favor of the accused.

302.    In addition, to the extent that more proceedings were actually initiated, e.g. with the Massachusettes Attorney General's Office, and subsequently terminated in Plaintiff's favor, Plaintiff additionally brings this causes of action for those independent malicious prosecutions.

303.    Plaintiff suffered damages as a result of the malicious prosecution, including but not limited to actual, compensatory, special, and general damages, emotional distress, damage to his reputation, loss of his job(s) at Tullett Prebon and Cuttone & Co., damage to his earning capacity (for his losses associated with a diminished book of business), damages associated with not being able to service his clientele, and future damages for lost profit (for inability to gain future employment and for damage to his book of business), interest, costs, attorney's fees, and punitive damages, in an amount not less than $5,000,000.00.

## EQUITABLE TOLLING / CPLR 203(g) DISCOVERY / FRAUDULENT CONCEALMENT

304.    Plaintiff repeats and realleges each and every allegation contained in this Complaint, as if set forth fully herein.

305.    Defendants, by the foregoing, purposely and intentionally kept their identities "anonymous," (e.g. the anonymous e-mail(s) in December of 2009 that Defendant(s) sent to Capstone and/or regulators; and the anonymous e-mail(s) in July of 2011 that Defendant(s) sent to Tullett Prebon and/or regulators).

306.    In addition, Defendants, by couching their defamatory statements as "tips" or "whistle-blowing" activity, were purposely trying to prevent the fact of, or content of, their defamatory statements from reaching Plaintiff, as in the heavily regulated securities industry, it was unlikely that Plaintiff's employers would share the e-mails with Plaintiff.

307.    Defendants in making their e-mails "anonymous," or couching them as regulatory "tips" or "whistle-blowing" e-mails, which they knew were false and defamatory, were taking specific and affirmative action to prevent Plaintiff from discovering the nature and existence of the defamatory e-mails.

308.    Further, the nature of the communications was false, and designed to deceive, so as to sufficiently constitute a fraudulent concealment and or omission.  Defendants intended to hide the fact that there was no basis in fact to their complaints and defamatory statements concerning Mr. Shah, and hid the fact that they were not *bone fide* whistleblowers and/or not making a truthful regulatory tip to Mr. Shah's employers.  Mr. Shah's employers acted in reasonable reliance upon Defendants' misrepresentation / omission, and thereby treated the e-mails with confidentiality, and did not share them with Mr. Shah.  As such, Mr. Shah did not discover them, and the statute of limitations should be tolled.

309.    Plaintiff was not granted access to these e-mails when he did learn of them, as Tullett Prebon, acting upon Defendants' implicit misrepresentations and/or omissions, treated the e-mails as bone fide tips or whistle-blowing.  It was not until Cuttone & Co. shared the defamatory e-mails they had in their possession (which are annexed hereto) that Plaintiff discovered the defamatory and tortious acts complained of herein.

310.    In addition, or in the alternative, due to Defendants' own unlawful misconduct, Plaintiff did not "discover" the facts essential to bring the causes of action herein, and therefore, the statute of limitations should be tolled as necessary pursuant to CPLR 203(g) ("discovery").

### Civil Conspiracy / Aiding and Abetting

311.    Plaintiff repeats and realleges each and every allegation contained in this Complaint, as if set forth fully herein.

312.    Defendants have engaged in a civil conspiracy to (1) Defame Plaintiff, (2) Tortiously Interfere with Plaintiff's Contracts of Employment, (3) Tortiously Interfere with Plaintiff's Prospective Economic Advantage, and / or (4) Engage in Malicious Prosecution of Plaintiff, as set forth herein).

313.    Defendants had an agreement among two or more of them, including, *inter alia*, an agreement to retaliate against Mr. Shah and/or damage the career of Mr. Shah, because he assisted regulators and reported Defendants' improper misconduct at ICAP, thereby alerting regulators to their actions, and/or led to regulators fining and sanctioning Defendants' misconduct.

314.    Defendants committed an overt act in furtherance of such agreement, including, inter alia, upon information and belief, discussing the matter and strategy in defaming Mr. Shah, tortiously

50

interfering with his employment contracts and/or his prospective economic advantage, and maliciously prosecuting him.  Defendants included a lawyer and two regulated persons in positions of power at different law firms, who colluded in designing a campaign of defamatory conduct against Mr. Shah.

315.    Defendants intended to participate in the furtherance of a plan or purpose, including, *inter alia*, Defendants were all motivated by their retaliatory vendetta for Mr. Shah's assistance to regulators in 2009 that exposed Defendants' malfeasance at ICAP, and worked together to cause Mr. Shah the maximum damage they could.

316.    Defendants' actions resulted in damage or injury to Plaintiff.

317.    Similarly, and/or in the alternative, Defendants have engaged in aiding and abetting one another in (1) Defaming Plaintiff, (2) Tortiously Interfering with Plaintiff's Contracts of Employment, (3) Tortiously Interfering with Plaintiff's Prospective Economic Advantage, and (4) Maliciously Prosecuting Plaintiff.

318.    Each of the Defendants provided each other substantial assistance.  Defendants each knew of the acts committed by the other(s), and affirmatively assisted, helped conceal (or failed to act when required to do so), thereby enabling the aforementioned misconduct.

319.    Defendants knowingly participated in the above-complained of acts.

320.    Plaintiff has suffered damages as a result.

## REQUEST FOR INJUNCTIVE RELIEF

In addition, Plaintiff has suffered, and will continue to suffer, harm that may not be remedied by monetary damages alone, and this Court should issue a TRO, preliminary and permanent injunction (1) prohibiting Defendants from any further contact with any of Mr. Shah's past, present or future employers concerning Mr. Shah (including but not limited to his research, his employment, his professional activities, or his clients), (2) prohibiting Defendants from any further contact with any clients of Mr. Shah, regarding Mr. Shah (including but not limited to his research, his employment, his professional activities, or his other clients), (3) prohibiting Defendants from continuing to file and/or make false reports to regulators and law enforcement officers, including but not limited to the SEC and FINRA, or speaking with anyone in any compliance department at any

firm regulated by FINRA regarding Mr. Shah.  Although requested herein, Plaintiff will present the Court with separate motion papers seeking this relief.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all the issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demands judgment against the Defendant as follows:

1.     On its First Cause of Action awarding to Plaintiff an amount to be determined at trial, but no less than $5,000,000.00;

2.     On its Second Cause of Action, awarding Plaintiff an amount to be determined at trial, but no less than $5,000,000.00;

3.     On its Third Cause of Action, awarding Plaintiff an amount to be determined at trial, but no less than $5,000,000.00;

4.     On its Fourth Cause of Action, awarding Plaintiff an amount to be determined at trial, but no less than $5,000,000.00;

6.     Together with reasonable attorneys' fees, costs, and disbursements of this action;

7.     Together with punitive damages, sufficient to punish Defendants for their wrongful conduct, and discourage similar like misconduct in the future, and

8.     All such other and further relief as to this Court may seem just and proper.

Dated: New York, New York
          June 23, 2014

                    NESENOFF & MILTENBERG, LLP
                    Attorneys for Plaintiff Sachin Shah

                    By: ___*Philip A. Byler, Esq.*_____
                         Philip A. Byler, Esq. (PB 1234)
                         Andrew T. Miltenberg, Esq. (AM 7006)

363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500

STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF NEW YORK       )

Sachin Shah, being duly sworn, deposes and says:

I have read the within Verified First Amended Complaint, know the contents thereof and the same are true to my knowledge, except those matters therein which are stated to be alleged on information and belief, and as to those matters I believe them to be true.

_____
              Sachin Shah

Sworn to before me this
June 23, 2014

_____
Notary Public

```
STEVEN BEYLIS
Notary Public - State of New York
NO. 01BE6287345
Qualified in Kings County
My Commission Expires Aug 5, 2017
```

54