UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SACHIN SHAH,<br><br>      Plaintiff,<br><br>  -against-<br><br>LESTER L. LEVY,<br><br>      Defendant. | 13-CV-02975 (LGS)(SN)<br><br><br>**CONFIDENTIAL** |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION FOR SANCTIONS**

Defendant respectfully submits this Memorandum of Law in support of his motion, pursuant to Fed. R. Civ. P. 26(g) and 37(b), and the Court's inherent authority, for an Order (i) prohibiting the plaintiff from making damage claims based on an alleged loss of revenue from clients, and (ii) awarding defendant's attorneys' fees and expenses incurred as a result of plaintiff's false interrogatory responses.[1]

## STATEMENT OF FACTS

**Plaintiff's Claim for Damages**

Since this matter's inception in May 2013 plaintiff has based his compensatory damages claim on the notion that the alleged defamation and/or his termination from Tullett Prebon ("Tullett") caused revenues he received from his clients to be diminished. Initially in December 2013, when defendant requested specificity regarding plaintiff's claim for lost business, plaintiff, in his responses to defendant's First Set of Interrogatories ("First Responses," a copy of which is Eagel Dec. Ex. A), refused to disclose who his clients were or how much business he supposedly lost from each client. After defendant objected to the First Responses as deficient [see Dkt. No. 65], plaintiff, in late-July 2014, eventually, in his supplemental responses to defendant's Second Set of Interrogatories ("Second Responses," a copy of which is Eagel Dec. Ex. B), provided a list claiming damages, supposedly based upon his commission monthly run rates when he was employed at Tullett, as to 67 clients. He refused to identity who the clients were or sign the interrogatory responses containing this list. Defendant again objected to plaintiff's deficient responses [see Dkt. No. 131], and on February 13, 2015, the Court ordered [see Dkt. No. 135] that:

---

[1] Also submitted in support of the motion is the declaration of Lawrence P. Eagel, dated November 10, 2015 ("Eagel Dec.").

1

> By February 27, 2015, the plaintiff must file proper responses and objections to all outstanding discovery requests, including by signing all responses to interrogatories. The plaintiff must also provide the names and contact information for the previously noted 67 clients who have relevant information regarding the plaintiff's claims.

In response to the Court's February 13, 2015 order, plaintiff provided verifications for the First Responses and Second Responses (copies of which are Eagel Dec. Ex. C) and the identity and contact information for the 67 clients plaintiff identified in the Second Responses (a copy of which is Eagel Dec. Ex. D). After receiving this information, defendant began to test plaintiff's damages claim by attempting to serve 17 subpoenas (the "Subpoenas") on plaintiff's alleged clients.

**Plaintiff's Damages Claim is Revealed to Be False**

In response to the Subpoenas, defendant received 13 declarations[2] (the "Declarations," copies of which are Eagel Dec. Exs. E-Q) from plaintiff's clients, all of whom refute, under oath, plaintiff's claim that there was a connection between plaintiff's allegations of wrongdoing in this action and any reduction in business with plaintiff. Certain of these declarants also deny that there was ever any relationship between them and plaintiff. The following chart summarizes the differences between the damages plaintiff swore to in the Second Responses and the truth as revealed by the Declarations:

---

[2] Defendant did not receive responses to three of the Subpoenas, and one of the Subpoenas had to be reserved under a different name than plaintiff listed in the Second Responses.

| Client[3] | Plaintiff's False Damages Claim | The Truth |
|---|---|---|
| No. 1 | $86,918 | Has no record of (i) any direct relationship with plaintiff, nor (ii) receiving any research or communication from plaintiff during relevant time period. (See Eagel Dec. Ex. Q). |
| No. 3 | $74,200 | Did not execute any trades with plaintiff after he left ICAP in 2009.<br><br>Decision to not execute trades with plaintiff's subsequent employers was unrelated to the conduct alleged by plaintiff in this action. (See Eagel Dec. Ex. E). |
| No. 14 | $26,547 | Had no relationship with plaintiff after plaintiff was terminated from Millennium in 2006. (See Eagel Dec. Ex. F). |
| No. 16 | $24,227 | "[S]ole reason" relationship with plaintiff ended after he left Tullett was because plaintiff's current employer (Albert Fried) was not an approved trading partner. (See Eagel Dec. Ex. G). |

---

[3] As the names of the alleged clients were marked "confidential" by plaintiff, to reduce the need for sealing, defendant refers herein to the alleged clients by the number assigned to them by plaintiff in the Second Responses. The alleged clients referenced in this memorandum of law are specifically identified in the Eagel Dec.

3

| | | |
|---|---|---|
| No. 26 | $13,305 | Plaintiff's change in employers had no impact on amount of business declarant has done or intends to do with Shah.<br><br>Unaware of misconduct alleged in this action. (See Eagel Dec. Ex. H). |
| No. 49 | $403,622 | Any reduction in business with plaintiff is the result of changes in the research market place. Misconduct alleged in this action had no impact. (See Eagel Dec. Ex. I). |
| No. 50 | $86,843 | Relationship with plaintiff ended in January 2015 because of closure and liquidation of affiliated funds. (See Eagel Dec. Ex. J). |
| No. 51 | $67,334 | Never decreased amount paid for plaintiff's services. (See Eagel Dec. Ex. K). |
| No. 52 | $41,528 | Unaware of misconduct alleged in this action. (See Eagel Dec. Ex. L). |
| No. 53 | $41,222 | Records show relationship with plaintiff only existed once he began work at Albert Fried, which is after the time period relevant to the misconduct plaintiff has alleged. (See Eagel Dec. Ex. M). |

4

| No. 54 | $38,600 | Relationship with plaintiff did not begin until he was working at Albert Fried.<br><br>Relationship with plaintiff ended because portfolio managers who utilized his research left the firm. (See Eagel Dec. Ex. N). |
|---|---|---|
| No. 55 | $30,917 | Began making payments for plaintiff's work in July 2013 when plaintiff was already at Albert Fried. (See Eagel Dec. Ex. O). |
| No. 60 | $13,465 | Relationship with plaintiff remained the same. Any reduction in business with plaintiff was a result of business needs. (See Eagel Dec. Ex. P). |

At plaintiff's deposition, plaintiff was confronted with Tullett's written statement as to plaintiff's actual commission rate. Plaintiff was then compelled to admit that his statements as to damages in his sworn interrogatory answers were false. (See Shah Tr. pp. 281-310, a copy of which is Eagel Dec. Ex. R).

Plaintiff admitted, among other things, that the monthly run rate of $3,000 he swore to for Client No. 3 "never existed" while he was at Tullett. (Shah Tr. 281:15-17). Plaintiff swore in his Interrogatory Answers that he had a $3,500 monthly run rate for Client No. 2. In fact, plaintiff had to admit that no commissions were received from that alleged client while plaintiff was employed by Tullett. (Shah Tr. 283:2-21). Client No. 52 was not one of plaintiff's clients at Tullett, so the alleged run rate from that client was a false statement. (Shah Tr. 284:22-24).

5

Client No. 53 "never" paid for plaintiff's services while he was employed at Tullett, so the monthly run rate in the interrogatory answers was false. (Shah Tr. 285:17-20).  The monthly run rate attributed to Client No. 56 never existed.   Plaintiff then stated that the run rate was actually for another alleged client, but had to admit that he did not factor into the alleged monthly rate any of the months plaintiff was not paid.  Thus, the monthly run rate was false. (Shah Tr. 288:18-23).

     Plaintiff stated in his interrogatory answers that Client No. 4 provided him a monthly run rate of $1,759.  At his deposition he was forced to admit that he only received a total of $450 in 17 months. Thus, the stated monthly run rate was false. (Shah Tr. 297:24—298:2).  Plaintiff stated in his interrogatory answers that Client No. 5 provided a monthly run rate of $1,667.  In truth, plaintiff was forced to admit Client No. 5 was never a client at Tullett. (Shah Tr. 300:14-16). Similarly, Client No. 6 never had trades at Tullett. (Shah Tr. 302:3-12).  Plaintiff stated in his interrogatory answers that Client No. 7 provided a monthly run rate of $1667.  At his deposition, plaintiff was forced to admit that Client No. 7 was never a client at Tullett.  (Shah Tr. 303:10-23).  Similarly, Client No. 8 did not provide any commission business to him when he was at Tullett. (Shah Tr. 305:3-5).  The alleged monthly run rate of $1250 for Client No. 10 was bogus, as it was never a client of his at Tullett.  (Shah Tr. 307:8-10).  Likewise, Clients Nos. 11, 17, and 18 were never clients of his at Tullett.  (Shah Tr. 309:14-310:9).

     At plaintiff's deposition, defendant's counsel did not have time to go through all 67 of his alleged clients, but the ones that he did have time to do (above) all showed that plaintiff had no factual basis for his interrogatory answers.   The Declarations received in response to the subpoenas confirmed the falsity of the sworn to interrogatory answers.

6

**ARGUMENT**

I. **Plaintiff's Conduct Warrants Sanctions**

"A federal district court possesses broad inherent power to protect the administration of justice by levying sanctions in response to abusive litigation practices." *Penthouse International, Ltd. v. Playboy Enterprises, Inc.*, 663 F.2d 371, 386 (2d Cir. 1981). Rule 37 of the Federal Rules of Civil Procedure permits a court to impose a "wide range of sanctions for …discovery abuses." *Mali v. Federal Ins. Co.*, 720 F.3d 387, 392 (2d Cir. 2013). These include but are not limited to: "orders deeming certain facts established; permitting an adverse inference instruction; striking pleadings; prohibiting the 'disobedient' party from making specific claims or introducing matters into evidence; dismissing a claim or the entire action or granting default judgment against the disobedient party; or entering an order of contempt." *Linde v. Arab Bank, PLC*, 269 F.R.D. 186, 195 (E.D.N.Y. 2010) ("*Linde I*") (citing *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 101 (2d Cir. 2002)). Under Rule 26(g), if a person falsely certifies that a disclosure is complete and correct, without substantial justification, the court <u>must</u> impose "appropriate" sanctions on the signer.

A. **Plaintiff's Verification of the Second Responses Is False**

In the Second Responses, plaintiff swore to (1) the accuracy of the lost customer damages calculations contained in response one, and (2) that his damages for "lost commissions" were calculated by "using the run-rate for Plaintiff Shah's clients from Tullett Prebon and calculated the loss of commissions from the clients that were lost since Tullett Prebon and using the run-rate for Plaintiff Shah's clients from Tullett Prebon and calculated the loss of commissions from the clients less the current commissions collected since Tullett Prebon (reduced business)." (See

7

response three).  As shown above, plaintiff's damages calculations are demonstrably false.  Thus, plaintiff's verification of the Second Responses is in violation of Rule 26(g).

Plaintiff is not helped by the "substantial justification" safe harbor contained in Rule 26(g)(3).  To be substantially justified there must be a genuine dispute regarding the appropriateness of the conduct at issue. *See Kosher Sports, Inc. v. Queens Ballpark Co., LLC*, 2011 U.S. Dist. LEXIS 86651, *33-34 (E.D.N.Y. Aug. 5, 2011).  Here, there is no genuine dispute as to the inappropriateness of plaintiff's verifications.

After much back and forth between the parties and an order by the Court, plaintiff chose to stand firm on his unsubstantiated damages claim rather than admit that he could not demonstrate that the defamation alleged caused any damages to revenues received from his clients.  Plaintiff identified his clients by number in July 2014.  (See Eagel Dec. Ex. B).  He did not supplement his responses and identify the clients until after the Court's February 13, 2015 order described above.  He, therefore, had ample time to reconsider his earlier responses and delete any or all of the clients on the earlier list.  Instead of doing so, he stood firm on the earlier answers, supplemented the answers with the identity of the alleged lost clients, and verified the accuracy of the information.  Tellingly, after receiving each of the Declarations, and after his deposition, plaintiff did not further supplement the Second Responses by providing honest damage calculations or challenge the Declarations by seeking additional discovery from his alleged former clients.  Under these circumstances, sanctions under Rule 26(g)(3) are mandatory. *See* Fed. R. Civ Proc. 26(g)(3) ("If a certification violates this rule without substantial justification, the court, on motion or on its own, <u>must</u> impose an appropriate sanction on the signer.…" (underline added)).

8

### B. Plaintiff Violated the Court's February 13, 2015 Order

As set forth above, after failing for over two years to respond adequately to Levy's interrogatories, the Court ordered plaintiff to "file proper responses and objections to all outstanding discovery requests." Rather than follow the Court's February 13, 2015 order and simply admit that he did not experience (or could not identify) any loss of business as a result of the defamation alleged in this action, plaintiff chose to stand firm on his false claim for loss of business damages. In response, as is his right to do, s*ee Penthouse*, 663 F.2d at 391, defendant through the Subpoenas and deposition of plaintiff, sought to, and did, prove that plaintiff's damages claim for loss of business is false. As set forth above, plaintiff did not have substantial justification for his interrogatory responses. Moreover, plaintiff's conduct, in light of the effort and expense undertaken by defendant to show the falsity of plaintiff's claimed damages, was not harmless. Under these circumstances the Court can infer that plaintiff acted in bad faith. *See Reichmann v. Neumann*, 553 F. Supp. 2d 307, 321 (S.D.N.Y. 2008) ("[B]ad faith can be inferred when the actions taken are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose."); *see also Gesualdi v. Metro Found. Contrs., Inc.*, 2011 U.S. Dist. LEXIS 116813, at *15 (E.D.N.Y. Sept. 7, 2011) (Preclusion of evidence is justified as a sanction "when the failure to comply with a court order is due to willfulness or bad faith, or is otherwise culpable.")

### II.     The Sanctions Sought by Defendant are an Appropriate Remedy

A district court has wide latitude to craft an appropriate sanction. *See Penthouse*, 663 F.2d at 386. Here, the sanctions sought by defendant are appropriate under the circumstances.

This matter has been pending since May 2013, and plaintiff has yet to provide a credible damages calculation. When plaintiff was given the opportunity to set forth his compensatory

9

damages claim he first refused and then lied. Thus, striking plaintiff's compensatory damages is an appropriate sanction. In addition, Rule 37(b)(2)(C) mandates that the "disobedient party" pay the reasonable expenses caused by the violation, including attorneys' fees, and the text of Rule 26(g)(3) recognizes that this is an appropriate sanction.

## CONCLUSION

Defendant's request to sanction plaintiff should be granted.

**BRAGAR EAGEL & SQUIRE, P.C.**

/s/ Lawrence P. Eagel
Lawrence P. Eagel
Justin Kuehn
885 Third Avenue, Suite 3040
New York, NY 10022
Tel: (212) 308-5858

-and-

**WOLF POPPER, LLP**

/s/ Lester L. Levy, Sr.
Lester L. Levy, Sr.
845 Third Avenue, 12th Floor
New York, NY 10022
Tel: (212) 759-4600

*Attorneys for Defendant*