# Exhibit C

## MEMORANDUM

To:   Ed Novak, Tom Trivella
From: Justin Lumiere
Date: May 8, 2009
RE:   Sachin Shah

---

### I. Background

Sachin has been employed as a research analyst on the Risk Arbitrage desk since Aug 2007. His employment contract is due to expire August 26, 2009. For the reasons detailed below relating to Sachin's deficient job performance and interpersonal skills, I recommend that we not to renew his contract or extend his employment beyond his contract date. As discussed below, I also recommend that we place Sachin on garden leave until his contract expiration date.

### II. Issues With Job Performance

Sachin has demonstrated poor organizational skills. Financial spreadsheets which he prepares contain broken formulas and data from previous unrelated projects. In addition, he has demonstrated poor verbal and written communication skills. Writing skills are crucial to the research analyst position; unfortunately, his work product has proven to be unorganized and scattered. His reports typically have to be fully rewritten prior to being released to our clients. As an example:

**Sachin's original version:**

*Although an YHOO/AOL deal is still a possibility, we contend the fact that a deal has yet to materialize, may be indicative of the possible reservations as well as the complexity of doing such a deal could mean to all respective shareholders involved. We think TWX has been more than willing to do a AOL deal with either YHOO or MSFT for some months now, but YHOO and MSFT may have their sights on each other as well as the possibility of stock issuance to TWX may have further delayed such a transaction. Also, YHOO's Board probably needs to conduct a simple transaction with any potential parties and its still unclear if a deal with TWX would facilitate such an outcome for their shareholders.*

**My rewritten version:**

*For the past six months, it has been speculated that YHOO has held informal discussions with TWX regarding a possible YHOO/AOL combination; another rumor has involved a possible MSFT/AOL tie-up. We estimate that a merged YHOO/AOL would create a conservative $300m-$500m in annual operational synergies.*

ICAP 00148

> *Although we do not rule out a YHOO/AOL combination, we maintain that the long delay in announcing such a transaction portends the complexities in structuring a merger acceptable to the respective companies' shareholders; it has been speculated that TWX would seek to retain a significant equity interest (18-20%) in the newly-created company.*

Sachin's verbal skills are also lacking. He is difficult to communicate with, as his communication is scattered and, at times, even incomprehensible.

There have also been significant substantive issues with Sachin's work product. For instance, many of Sachin's valuations are flawed based on the misapplication of standardized / accepted valuation methodologies. For example:

> Example 1: He assigned an additional $10/share in value to ROH due to Net Operating Loss Carryforwards ("NOLS").

> Example 2: Double counted equity investments in his DCF for YHOO.

> Example 3: In his YHOO valuation, he did not adjust EBITDA for non-cash compensation expense.

In addition, Sachin is unfamiliar with legal aspects of corporate issues, yet is unwilling to take appropriate advice from Les Levy who was hired as a legal advisor for the desk. Due to his refusal to work with Les, Sachin's entire legal analysis on the BUD/InBev situation was completely flawed.

When informed of his errors, Sachin refuses to make amendments to his valuations and continues to stubbornly defend his mistakes. Clients have complained about his valuation skills, yet Sachin refuses to accept any constructive criticism or to consult reference materials. I do not foresee Sachin improving in these significant problem areas because of his attitude and refusal to accept constructive criticism. By contrast, other members within the research group openly accept my constructive criticism and welcome the opportunity to learn and to improve their skills and performance.

### III. Interpersonal Skills

Sachin's interpersonal skills often create an unproductive and hostile atmosphere on the desk. It is very difficult to speak with Sachin in a rational manner. Even when someone offers him constructive criticism, he gets defensive and refuses to consider any advice or guidance. Even his external communications can be hostile and/or demeaning in tone. For example, on March 19, 2009, Dana Eisenberg had a conversation with Mark Steinkrauss (VP Corporate Relations, US Cellular Corporation ("USM"), who asked Dana who Sachin was and then remarked that he hopes Dana *"doesn't make smart-ass remarks like Sachin"* because they (USM) *"do not take kindly to rudeness."* Our sales team has also remarked that Sachin is hostile toward clients.

ICAP 00149

In another incident, on April 14, 2009, I asked Sachin to send out a report. He refused to do so, and after some discussion, he quickly stood up from his chair and got directly in my face, standing very close to my body. When I asked him to please sit back down, he refused and, while remaining right in my face, grew increasingly hostile. I told Sachin that he was being insubordinate and what he was doing was grounds for dismissal, to which he responded: *"Fine, fire me then, go ahead!"* I ended up having to walk away. This was observed by the entire Risk Arbitrage desk, as well as some members of the Cash Equity desk.

Sachin is not a team player. He continuously alienates himself from other members of the Risk Arbitrage group. He is insubordinate and continues to question my authority, and has been hostile during our weekly analyst/sales meeting. When I told him he *could* work on the CF/TRA AGU/CF situations, he repeatedly yelled and asked why I was *preventing* him from working on that situation. I continued to tell him that I had said he *could* indeed work on it, yet he continued to yell and scream. This disrupted the meeting, and led Mitch Fang from sales to question the organization within our research department.

In addition, Sachin refuses to work with others on any project. He also frequently belittles Dana Eisenberg by commenting to the group that Dana is an unseasoned analyst who does not understand Special Situations or Discounted Cash Flow analysis. These comments are not only unsupported, but have the effect of unnecessarily demeaning Dana in front of his colleagues. As an example of Sachin belittling Dana (and challenging how I run the desk):

**From an email on 12/5/08:**

*Hi Justin, I just spoke with Dana and he is looking over my YHOO model – this is very surprising to me because I wasn't aware that he was doing this until now. If you have comments over my YHOO model you are welcome to share them with me, but I don't think it is appropriate for Dana or Les to look at my model and make suggestions as he clearly doing my writing down notes on it. Especially, since he is looking at websites and looking at books referencing how DCF's model and assumptions should be calculated. Also, my YHOO model hasn't changed materially since you last reviewed it (also my DCF model template is the same as previous companies I have covered). So, if you have any specific questions on it I can address them to you personally, but think it is very inappropriate for Dana who doesn't know anything about YHOO, the industry or seems on DCFs and is not licensed Research Analyst to be reviewing my model and making these recommendations to you or anyone that else for that matter and then have you share those recommendations with me. I think this process is highly unusual for now and has been used in the past. I know that you have practiced this with Les since he doesn't have experience on valuation or modeling, but I don't believe this process should be used with me. You have even acknowledge this several times to me and not sure why this is being done now. To foster a better time schedule for the YHOO report to go out to clients,*

ICAP 00150

> *can you tell me when you will be done reviewing the report and any assumption questions you may have that I have made in my YHOO model.*
> *Thanks, Sachin*

Sachin often refuses to speak with coworkers at all, and is only willing to communicate via email. Obviously, this is not an efficient or productive way to interact within a team. Overall, Sachin's lack of interpersonal skills makes it difficult to accomplish our work-related goals. By contrast, the other members within the Risk Arb group get along in a collegial and respectful manner at all times and have more productive working relationships.

### IV. Future Direction for Desk/Business

We are currently completing the overhaul of our research platform and will begin to focus on issuing more reports. With this refocused emphasis, the deficiencies in Sachin's work product as discussed above (including his difficulty in completing an analysis on his own, and his poor writing and analytical skills) will become even more of a detriment. I recommend that we enhance the position by replacing Sachin with an analyst with stronger writing and analytical skills and the ability to function more independently.

### V. Recommendation

Based on foregoing, I recommend that we terminate Sachin's employment upon expiration of his contract in August. I further recommend that, between now and then, we relieve Sachin of his active duties for two reasons. First, given both the problems with his work product and his interaction with the rest of the team, his continued active employment is detrimental to our group and our business. Second, out of fairness to Sachin, if we determine to not renew his contract or continue his employment beyond August, we should give him as much notice as possible so that he has ample opportunity to seek new employment while in a position of being currently employed. Of course, we should continue to fulfill all contractual compensation obligations to him. In addition, if he finds a new opportunity before the expiration of his contract, I would recommend that we release him from his employment agreement and any non-compete restrictions.

ICAP 00151

May 11, 2009

**Via Hand at ICAP**
Sachin Shah
37 Evergreen Drive
North Caldwell, New Jersey 07006

      Re: **Termination of Employment**

Dear Sachin:

  This shall confirm our meeting today wherein you were advised that ICAP Corporates LLC (the "Company") does not intend to renew your employment agreement, or otherwise continue your employment with the Company, beyond August 26, 2009 (the "Termination Date").

  Your employment with the Company shall terminate on the Termination Date; however, effective immediately, you shall be placed on garden leave, and will be required not to report to the Company's offices and not to perform any duties or services on behalf of the Company (including, but not limited to, speaking to any customers or to the media on behalf of the Company). During the period of garden leave, you will remain an employee of the Company, you will continue to receive all compensation due under your employment agreement, and you will remain on all Company benefits.

  This letter shall also serve as notice that, following the Termination Date, the Company waives the post-employment restriction on competition set forth in Section 7.1 of the employment agreement. Moreover, in the event that you receive an opportunity for new employment prior to the Termination Date, please contact me. The Company will give reasonable consideration to releasing you from employment with the Company, and to waive your restriction on competition, prior to the Termination Date in order to accommodate such opportunity.

  Best of luck in your next endeavors.

             Very truly yours,

             Thomas Trivella
             Senior Vice President – Equity Division

ICAP 00152