# Exhibit E





Tullett Prebon Financial Services LLC
101 Hudson Street
Jersey City
NJ 07302-3908
USA

**PRIVATE AND CONFIDENTIAL**

tel   +1 201 557 5000
fax   +1 201 557 5995

web   www.tullettprebon.com

**BY HAND**

August 2, 2011

Sachin Shah
c/o Tullett Prebon Financial Services LLC
101 Hudson Street
Jersey City, New Jersey 07302

Dear Sachin:

Tullett Prebon Financial Services LLC ("Tullett Prebon") is pleased to set forth certain terms and conditions in this letter and the attached Terms and Conditions (together, the "Agreement") under which it may choose to employ you. This Agreement supersedes any previous agreements that you may have entered into with Tullett Prebon. Certain of the terms and conditions of your Agreement are as follows:

*Commencement Date:*  This will be the later of (i) August 1, 2011; (ii) the date on which you are definitively no longer bound by or are released from any employment agreement or other non-compete or other restrictions with your current employer that would prevent or interfere with you performing services for Tullett Prebon and first report to work; or (iii) the date that this Agreement has been executed by both you and an authorized representative of Tullett Prebon (the "Commencement Date").

*Contract Term:*  The term of your employment under this Agreement (the "Contract Term") shall be the period from the Commencement Date to the date that is three (3) months after either party notifies the other in writing of its intent to have the Agreement and your employment hereunder terminate (a "Notice of Termination").

*Job Title:*  You will be employed as a Vice President and Broker in the Equity Derivatives area of Tullett Prebon. Tullett Prebon reserves the right to modify, alter, increase or decrease your job responsibilities and assignments from time to time in accordance with Tullett Prebon's operational requirements and legitimate business needs, provided that such changes do not unreasonably interfere with your ability to service your Client List (as defined in Paragraph 7).

*Base Salary:*  You will be paid an annual base salary of $200,000 in semi-monthly payments of $8,333.33, less applicable withholdings and any other items which Tullett Prebon may be required or authorized by law to deduct for the period commencing with the Commencement Date and ending on the completion of the Contract Term ("Base Salary"). You are exempt from a

1

premium overtime pay rate. In accordance with Tullett Prebon's payroll practices, you will be paid semi-monthly on the 15th and the last working day of each month.

Notwithstanding the foregoing, in the event your performance ratio falls below 2:1 (Net Revenue: Costs) in respect of any rolling period of three (3) consecutive calendar months during the Contract Term, Tullett Prebon may, in its sole discretion, reduce your annual Base Salary to a level which would be consistent with a 2:1 ratio for such three (3) month period. Such reduced Base Salary shall be in effect for the balance of the Contract Term, subject to further reductions in accordance with this paragraph.

For purposes of this Agreement: (i) "Net Revenue" shall mean, for the relevant full fiscal year, 100% of brokerage revenues received by Tullett Prebon during such full fiscal year that are directly attributed to transactions executed by and credited to you, less discounts, clearing costs, confirmation costs, trade differences, transaction fees, licensing tariffs and excluding any items or sources of revenues or percentages thereof agreed, in writing by the parties from time to time. Net Revenue shall exclude brokerage revenue received by Tullett Prebon during such full fiscal year that is attributable to business executed by you that is introduced, or otherwise facilitated, by other desks of Tullett Prebon. You may be paid a fee for business introduced and/or facilitated by other Tullett Prebon desks and the specific fee shall be determined in the sole and absolute discretion of Tullett Prebon; and (ii) "Costs" shall mean, for the relevant period, the total expenses paid or accrued during such period in respect of your base salary, guaranteed bonus, if any, employee benefits and payroll taxes (including, without limitation, payments in respect of FICA, FUTA and other similar charges paid by Tullett Prebon).

*Benefits:*   You will be entitled to participate in medical insurance and other employee benefit plans maintained by Tullett Prebon in accordance with the terms and conditions of those plans, which may include waiting periods, co-payments and other types of restrictions or limitations. Please refer to the summary plan descriptions for more information. Tullett Prebon reserves the right to change or modify these benefits from time to time.

*Bonus:*   You will be entitled to receive a bonus as set forth in the Bonus Schedule attached hereto as Exhibit A.

You agree that bonuses are not only a reward for past service but also an incentive to remain in employment with Tullett Prebon. As such, you acknowledge that your bonus, if any, consists of a past performance element and a loyalty element. Please refer to Paragraph 4.2 of the Terms and Conditions for further details in this regard.

*Certain Restrictions:*   **Your employment shall be subject to certain non-compete and non-solicitation restrictions relating to clients and staff as detailed in Paragraph 6 of the Terms and Conditions, which may continue following the termination of your employment agreement.**

CONFIDENTIAL - TP000060

| | |
|---|---|
| *General Conditions:* | The terms of your employment include the Terms and Conditions attached hereto. In the event of an inconsistency between this letter and the Terms and Conditions, the Terms and Conditions shall prevail. |

Your employment with Tullett Prebon is expressly conditioned upon you not being bound by an employment agreement or other non-compete or other restrictions with your current employer that would prevent or interfere with you performing services for Tullett Prebon on the Commencement Date. By entering into an employment agreement with Tullett Prebon, you expressly represent and warrant that on the Commencement Date you will not be bound by any agreement of employment and that your acceptance of employment with and performance of services for Tullett Prebon as contemplated herein would not conflict with or result in a breach of any agreement of any kind to which you are currently or then bound.

Please note, once signed by the parties hereto, this Agreement forms an irrevocable binding commitment by you to join Tullett Prebon as soon as you are legally and reasonably able to do so. You further agree that you will not enter into a new agreement (or an extension of your current contract) with your current employer or any other person or entity that would prevent you from performing services for Tullett Prebon hereunder or otherwise delay the Commencement Date beyond the date that you would have otherwise been able to lawfully join Tullett Prebon. In the event you fail to commence employment with Tullett Prebon on the date you are lawfully able to do so given your current contractual restrictions, you agree to pay to Tullett Prebon, as liquidated damages and not as penalty, a sum equal to the aggregate amount of compensation, including base salary and bonus, that Tullett Prebon has agreed to pay to you during the Contract Term.

Your employment is further contingent upon compliance with the Immigration Reform and Control Act and satisfactory references and background check.

If you are interested in employment with Tullett Prebon on the terms set forth herein, please sign and return the enclosed duplicate copy of this letter and the Terms and Conditions to the Human Resources Department.

This Agreement is not an offer capable of acceptance by you. Once signed by you, this Agreement shall be an offer by you to enter into the Agreement as set forth herein. That offer by you shall not be deemed accepted by Tullett Prebon until this Agreement is countersigned by an authorized representative of Tullett Prebon. For the avoidance of doubt, this Agreement shall be effective, and only become an enforceable contract, when executed by both parties thereto.

Sincerely,

TULLETT PREBON FINANCIAL SERVICES LLC

By _____
Name: Thomas Bovitz
Title: Senior Managing Director
Date: 8/3/11

CONFIDENTIAL - TP000061

By signing below, I confirm my agreement to the terms and conditions of employment set forth in this letter and the attached Terms and Conditions. In addition, I agree that I have been notified of my pay rate, overtime rate (if applicable), allowances and designated pay day on the date set forth below.

_____
Name: Sachin Shah
Date: 6/3/11

4

CONFIDENTIAL - TP000062

## **Exhibit A**

## BONUS SCHEDULE

In addition to the compensation provided for under *Base Salary* and subject to Paragraph 4 of this Agreement, you will be entitled to receive the following bonuses:

I. A non-discretionary production bonus in respect of each full fiscal year during the Contract Term in an amount at least equal to the difference between (i) 40% multiplied by Net Revenue minus (ii) 100% travel and entertainment expenses attributable to you minus (iii) employee benefits and payroll taxes (including, without limitation, payments in respect of FICA, FUTA and other similar charges paid by Tullett Prebon) minus (iv) the aggregate amount of your Base Salary for such full fiscal year ("Production Bonus"). In the event that the foregoing calculation yields a negative amount ("Negative Balance") in respect of any full fiscal year of the Contract Term, Tullett Prebon reserves the right to carry such Negative Balance over to the following fiscal year and, to the extent applicable, to subsequent fiscal years until the Negative Balance is fully recouped by Tullett Prebon.

II. You may also be eligible to receive a discretionary bonus above and beyond the Production Bonus in respect of each full fiscal year.

You may receive an advance drawn against your Production Bonus in respect of each semi-annual period (as designated by Tullett Prebon from time to time) during the Contract Term in an amount determined in the sole and absolute discretion of Tullett Prebon in accordance with its then existing policy, but no later than the same time as other comparable employees within the Equity Derivatives area are paid. With respect to the foregoing, in the event that you are paid a semi-annual advance drawn against your Production Bonus that is greater than the Production Bonus payable to you for the relevant fiscal year, Tullett Prebon shall be entitled to recoup any overpayment resulting from the semi-annual advance.

CONFIDENTIAL - TP000063

# EMPLOYMENT AGREEMENT SUMMARY

[ X ] New Employee      [   ] Existing Employee

[ X ] New Agreement      [   ] Amendment [# ]

| | |
|---|---|
| EMPLOYEE | SHAH, Sachin |
| EMPLOYER | Tullett Prebon Financial Services LLC |
| TEAM/DESK | Equity Derivatives |
| COMMENCEMENT/EFFECTIVE DATE | August 3, 2011 |
| DATE SIGNED | August 3, 2011 |
| INITIAL TERMINATION DATE | 3 months rolling |
| INITIAL NOTICE DATE | N/A |
| ROLLING NOTICE PERIOD | 3 months |
| SIGN ON BONUS | None |
| SALARY | $200,000 |
| 2:1 SALARY PRODUCTION | 2:1 for 3 consecutive months |
| BONUS (including any guarantees) | I. Non-Discretionary Production Bonus: annual equal to difference btwn (i) 40% x NR minus (ii) 100% T&E minus (iii) employee benefits and payroll taxes minus (iv) aggregate amount of base salary. Negative Balance language included. II. Discretionary annual |
| ADDITIONAL BENEFITS | None |
| TITLE | Vice President and Broker |
| NONCOMPETE | None |
| 4.5% T & E CLAUSE | 100% deducted from Bonus |
| SPECIAL MISCELLANEOUS | None |



CONFIDENTIAL - TP000058

Page 1

```
 1
 2     UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
 3     CASE NO.: 13-cv-2975(LGS)
       ------------------------------------------x
 4     SACHIN SHAH,
 5
 6                    Plaintiff,
 7         -against-
 8
       JUSTIN S. LUMIERE, et. al,
 9
10                    Defendants.
       ------------------------------------------x
11
12                         April 16, 2015
                           9:30 a.m.
13
14
15           DEPOSITION of THOMAS BOVITZ,
16     Nonparty witness in the above-captioned
17     matter, pursuant to Subpoena, held at the
18     offices of Wolf Popper, 845 Third Avenue, New
19     York, New York, before Eileen Mulvenna,
20     CSR/RMR/CRR, Certified Shorthand Reporter,
21     Registered Merit Reporter, Certified Realtime
22     Reporter and Notary Public of the State of
23     New York.
24
25
```

Page 38

```
 2  summary, there's a column for 2:1 salary
 3  production. And it says "2:1 three
 4  consecutive months."
 5          What does that refer to?
 6      A.  This is a provision that allows
 7  us to adjust someone's salary based upon
 8  performance.
 9      Q.  So what does two for one mean?
10      A.  In its simplest form, it means
11  that a person needs to produce twice as much
12  as their salary in order to keep that salary
13  at that current level.
14      Q.  Is it just salary or does that
15  also include other costs of their employment?
16      A.  I believe there's other costs
17  included as well.
18      Q.  Like, for example?
19      A.  T&E. In his case, I believe T&E
20  was taken into consideration.
21      Q.  What about insurance benefits?
22      A.  I'm not sure.
23      Q.  So he would have to produce
24  revenue to the firm that is at least twice
25  what he's costing the firm for three
```

Page 39

```
 2  consecutive months; is that correct?
 3      A.  Well, I believe the "three
 4  consecutive month" language means that when
 5  we're looking at this, we would look back
 6  upon the previous three months revenue
 7  numbers to determine our course of action
 8  going forward.
 9      Q.  Okay. Now, can you look at the
10  next column, Bonus, and explain to me what
11  that refers to?
12      A.  That would be his bonus
13  calculation.
14      Q.  So one would be a
15  nondiscretionary production bonus. Annual
16  equal to difference between 40 percent
17  times --
18          Is that net revenue?
19      A.  Net revenue.
20      Q.  -- minus a hundred percent T&E,
21  minus employee benefits and payroll tax,
22  minus aggregate amount of base salary.
23  Negative balance language included.
24          Can you explain that to me?
25      A.  Negative -- the whole thing or
```

Page 40

```
 2  just the negative balance?
 3      Q.  The whole thing.
 4      A.  Well, you would take the net
 5  revenue number, and that number would be his
 6  commissions generated minus any execution
 7  costs associated, times 40 percent, minus
 8  100 percent of his T&E costs, minus whatever
 9  his employee benefits and payroll taxes would
10  be, and minus the aggregate amount of his
11  base salary for that period.
12          And the negative balance
13  language is for any given bonus period, if he
14  did not -- was not owed a bonus, that could
15  be carried over into the next bonus
16  calculation.
17      Q.  Okay. I'm not sure I understand
18  that. Let's say for the year 2011 he doesn't
19  earn a bonus --
20      A.  Let's just say he -- he was a
21  $10,000 negative. Say he didn't produce
22  enough revenue to cover the costs that were
23  associated with his employment --
24      Q.  Okay.
25      A.  -- that $10,000 would be carried
```

Page 41

```
 2  over into the next period. And let's say for
 3  that period, he was owed $50,000 bonus, a
 4  $10,000 carry-over would be deducted from
 5  that $50,000.
 6      Q.  Okay. Now, towards the bottom
 7  of the page, there's a Column 4.5 percent T&E
 8  costs.
 9          Can you tell me what that refers
10  to?
11      A.  It means that he was not allowed
12  to spend over four and a half percent.
13      Q.  Of what?
14      A.  Of his revenue number.
15      Q.  And the 100 percent deducted
16  from bonus?
17      A.  Means that he is responsible for
18  a hundred percent of his T&E costs.
19      Q.  Let's go over the contract,
20  Exhibit 26. On page 2, the first full
21  paragraph, it says, "Notwithstanding the
22  foregoing" -- which is his base salary -- "in
23  the event your performance ratio falls below
24  two-to-one (net revenue: Costs) in respect
25  of any rolling period for three consecutive
```

Page 42

```
 1
 2   calendar months during the contract term,
 3   Tullett Prebon may in its sole discretion
 4   reduce your annual base salary to a level
 5   which would be consistent with a two-to-one
 6   ratio for such three-month period.
 7           "Such reduced base salary shall
 8   be in effect for the balance of the contract
 9   term subject to further reductions in
10   accordance with this paragraph."
11           Can you give me your
12   understanding of that term?
13      A.   Meaning that -- kind of what I
14   explained before -- it gives us the ability
15   to lower salary in line with where his
16   production is.
17      Q.   Okay. And that's in your sole
18   discretion, if he doesn't meet the two to one
19   ratio?
20      A.   In sole discretion, yes.
21      Q.   If you turn to page TP 67, I'm
22   looking at paragraph 6.2.2, 6-2-2, it's about
23   a third down from the top of the page.
24      A.   Uh-huh.
25      Q.   Can you tell me what that refers
```

Page 43

```
 1
 2   to?
 3      A.   Directly or indirectly?
 4      Q.   Yes.
 5           (Witness peruses the exhibit.)
 6      A.   Section 6 is in regards to
 7   competition and nonsolicitation. I assume
 8   this is after Sachin had left --
 9           MR. DUGAN: This modifies this
10      (indicating).
11           THE WITNESS: Oh.
12           (Witness peruses the exhibit.)
13           THE WITNESS: Actually, I don't
14      understand this. I don't understand
15      it.
16   BY MR. LEVY:
17      Q.   Okay. Let's work through it
18   together.
19           It seems to be a restriction on
20   his ability to solicit business or do
21   business with customers of Tullett Prebon to
22   whom he provided services while employed at
23   Tullett Prebon.
24           Am I reading that correctly?
25      A.   I mean, I'm not a lawyer. I
```

Page 44

```
 1
 2   didn't draft this document. So --
 3      Q.   Did you agree to this contract?
 4      A.   I did sign it, yes.
 5      Q.   Do you recall any discussions
 6   with Mr. Shah about his ability to do media
 7   appearance or interviews while employed at
 8   Tullett?
 9      A.   Yes.
10      Q.   What do you recall about that?
11      A.   I recall that he -- he would
12   have liked to continue doing his media
13   appearances if employed by Tullett Prebon.
14      Q.   What is your understanding of
15   what media appearances he was doing?
16      A.   He was doing a piece for
17   Bloomberg, and that's all I was aware of.
18      Q.   Did you give Mr. Shah approval
19   to do media appearances while he was employed
20   at Tullett?
21      A.   We did.
22      Q.   Were there any restrictions on
23   his ability to do that?
24      A.   I don't know.
25      Q.   Did you monitor some of the --
```

Page 45

```
 1
 2   monitor what he was saying during these media
 3   appearances?
 4      A.   I don't know for sure.
 5      Q.   Did he need prior approval
 6   before he would give an interview or appear
 7   on a media stage?
 8      A.   I don't know for sure.
 9      Q.   Who would know that?
10      A.   I don't know the answer to that.
11      Q.   Who was Mr. Shah's supervisor
12   while he was employed?
13      A.   I was.
14      Q.   Did you ever see recordings of
15   Mr. Shah's media appearances?
16      A.   I did.
17      Q.   And how many have you seen?
18      A.   I don't recall.
19      Q.   Were these recordings that took
20   place while he was employed at Tullett?
21      A.   Yes.
22      Q.   Do you recall whether in any of
23   those media appearances, Mr. Shah disclosed
24   any conflicts of interest that he might have
25   with respect to the statements he was making?
```

12 (Pages 42 - 45)