```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
  SACHIN SHAH,                                              :
                                       Plaintiff,           :
                                                            :      13 Civ. 2975 (LGS)
                  -against-                                 :
                                                            :      OPINION AND ORDER
  LESTER L. LEVY,                                           :
                                       Defendant.           :
------------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/31/2016

LORNA G. SCHOFIELD, District Judge:

Plaintiff Sachin Shah brings this action against a former co-worker, Defendant Lester Levy, based on e-mails that Levy sent to Shah's employers. Levy moves for summary judgment on all remaining claims -- a defamation claim and a tortious inference with contractual relations claim under New York law. For the reasons stated below, the motion is denied.

## I.   BACKGROUND

The following facts are taken from the parties' submissions and are undisputed unless otherwise indicated.

Between 2007 and 2009, Shah and Levy worked at a brokerage firm, ICAP. Their supervisor was Justin Lumiere. During this period, Shah reported to ICAP's management that Levy and Lumiere were violating securities laws. Shah also made these allegations to the FBI, SEC and Financial Industry Regulatory Authority, Inc. ("FINRA").[1] In May 2009, Lumiere recommended that ICAP not renew Shah's employment contract because of Shah's deficient job

---

[1] "FINRA is a self-regulatory organization . . . registered with the SEC . . . . It is responsible for conducting investigations and commencing disciplinary proceedings against [FINRA] member firms and their associated member representatives relating to compliance with the federal securities laws and regulations." *Fiero v. Fin. Indus. Regulatory Auth., Inc.*, 660 F.3d 569, 571 (2d Cir. 2011) (internal quotation marks and citations omitted).

performance and interpersonal skills. ICAP did not renew Shah's contract, which expired in August 2009.

### A. Shah's Employment at Tullett

According to Shah, he began working at Tullett Prebon Financial Services LLC ("Tullett") on July 20, 2011. On July 21, 2011, Levy sent an e-mail to Thomas Bovitz of Tullet regarding "a brand new hire of [Tullett's], Sachin Shah." Levy stated that he had worked with Shah at ICAP and that Shah was "nothing but trouble." Levy claimed that Shah had been "fired from basically every job that [Levy was] aware of," "engaged in [securities] violation" at ICAP and was under investigation by FINRA for "allegations of securities violations." Levy concluded, "[I]f [Shah] gets fired then he will just go to [FINRA] and retaliate against you guys, which he has done in the past."

Shah and Bovitz executed Shah's employment contract with Tullett on August 3, 2011. Bovitz testified that an initial hiring authorization form gave Shah a one-year term of employment that would automatically renew unless Tullett provided notice three months prior to the end of the term. The finalized contract, however, did not give Shah successive one-year terms. Instead, it stated that Shah's employment would end three months after "either party notifi[ed] the other in writing of its intent to have . . . [Shah's] employment . . . terminated."

In March 2012, Levy, using an alias, sent an e-mail to Bovitz. In the e-mail, Levy pretended to be a Tullett employee who had seen Shah "going on public message boards and posting about matters in violation of FINRA rules." In July 2012, Levy, using the same alias, sent an e-mail to Bovitz, again alleging that Shah was posting "in violation of company and [FINRA] policies." Levy also wrote that he told FINRA that he had reported Shah's posting to "legal and compliance at Tullet[t] who took no action and did not report it to [FINRA]."

On November 19, 2012, Levy sent Bovitz an e-mail, under the same alias, claiming that he had contacted the Massachusetts Attorney General's ("AG") Office about Shah. The e-mail included a response from the AG's Office with the subject line "RE: Sachin Shah – Illegal Trading." Levy also stated, "When are you going to listen that this guy is nothing but trouble and a liar and a snake."

At his deposition, Bovitz stated that he had forwarded Levy's e-mails to Tullett's compliance and legal departments. Bovitz also testified, "I believe that we didn't find . . . any wrongdoing by [Shah]. That's why he remained employed." Bovitz said the e-mails did not cause him to change his opinion of Shah.

On December 19, 2012, Shah received a letter terminating his employment with cause effective immediately. Bovitz testified that he had fired Shah because Shah told certain clients he was no longer going to send them market commentary. One week prior to the termination, Shah's salary had been reduced from $200,000 to $130,000.

Shah disputes the reason for his termination, asserting that Bovitz had given Shah permission to stop sending market commentary to certain clients. He testified that after his salary was reduced, he informed Bovitz that he was going to remove certain individuals from his distribution list because it was "not fair to [Shah's] clients, that he had individuals on [his] distribution list that weren't paying [him]" for his research. Bovitz, according to Shah, said it would be "fine" for Shah to do that.

In January and March 2013, Levy sent e-mails to Shah taunting him for not having a job. In a January e-mail, Levy stated he would make it his "mission in life to make sure you keep getting fired from jobs." Shah forwarded the e-mails to an individual at FINRA.

3

B.     **Shah's Employment at Cuttone**

Around March 2013, Shah was hired by Joe Cuttone for a position at Cuttone & Company, Inc. ("Cuttone").  On March 25, 2013, Levy sent an e-mail to Joe Cuttone in which Levy pretended to be Lumiere, Shah's supervisor at ICAP.  In the e-mail, Levy stated that Shah's activities "have routinely been investigated by FINRA as well as the State Attorney General's Office."  Levy also wrote that Shah's "activities with Bloomberg TV violate numerous securities laws."  That same day, Levy, again posing as Lumiere, sent another e-mail, stating that Tullett fired Shah because of "his suspicious trading activities and posting on message boards."

On April 1, 2013, Levy wrote to Joe Cuttone stating that "unless [Shah] is terminated by your firm for . . . lying . . . on his resume and other false statements he made to you, I will contact various securities regulators which will in turn get your firm investigated."  One week later, Levy sent an e-mail to FINRA -- and copied Joe Cuttone -- asserting that Shah continues to violate FINRA's rules and that, although Cuttone had been advised of these allegations, it had "disregarded my warnings and ha[s] turned a blind eye to [Shah's] illegal trading and front running activities."

Cuttone terminated Shah around April 12, 2013.  In May 2013, Cuttone's law firm wrote a letter to FINRA explaining that Shah was terminated because he "did not disclose to [Cuttone] during the hiring process that he was in contact with FINRA regarding allegations apparently made by a former colleague of his about conduct occurring at a prior firm."

In April 2013, Levy sent Shah an e-mail stating, "I just got you fired from Cuttone . . . [I] will follow you to the ends of this earth to make your life as miserable as you made mine and everyone else's."  In May 2013, Levy again wrote to Shah, stating that Shah must have "regret[ted]" his decision to report his co-workers at ICAP to FINRA because "they will always

4

contact any employer you are at and get you fired, just like they did with [T]ullett and [C]uttone recently. [Y]ou are unemployable."

Shah testified that Levy's e-mails to his employers caused him to suffer emotional distress. He also attests that the frequency with which he made appearances on the television and radio to offer market commentary decreased following his terminations from Tullett and Cuttone.

## II. STANDARD

Summary judgment is appropriate where the record before the Court establishes that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must construe the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in favor of the nonmoving party. *See id.* at 255.

## III. DISCUSSION

### A. Tortious Interference With Contractual Relations

Levy moves for summary judgment on Shah's tortious interference claim, arguing that no reasonable jury could find that his e-mails caused Shah's termination. Levy's motion is denied because a genuine factual dispute exists regarding causation.

"The tort of inducement of breach of contract, now more broadly known as interference with contractual relations, consists of four elements: (1) the existence of a contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and (4)

5

damages to plaintiff." *Kronos, Inc. v. AVX Corp.*, 612 N.E.2d 289, 292 (N.Y. 1993). Where the claim concerns interference with at-will employment, a plaintiff must show "malice or wrongful conduct." *Commander Terminals Holdings, LLC v. Poznanski*, 923 N.Y.S.2d 190, 194 (2d Dep't 2011).

"Causation is an essential element of a claim for tortious interference with contractual relations. Such a cause of action requires proof that, 'but for' the defendants' conduct, the plaintiff would not have breached its contract with a third party." *Ullmannglass v. Oneida, Ltd.*, 995 N.Y.S.2d 776, 778 (3d Dep't 2014).

Contrary to Levy's contentions, a reasonable jury could conclude that Shah would not have been terminated from Tullett and Cuttone but for Levy's e-mails. As to his termination from Tullett, both the content of the e-mails and the sequence of events support an inference of causation. One month prior to Shah's termination, Levy sent an e-mail exhorting Bovitz that Shah "is nothing but trouble and a liar and a snake" and informing him that the Massachusetts AG's Office was alerted to Shah's "insider trading." Four months earlier, Levy told Bovitz that he had reported Tullett to FINRA for not investigating the allegations concerning Shah's wrongdoing. *Cf. Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013) (finding in the Title VII context that a seven-month gap between the conduct at issue and an adverse employment action can be "sufficient to raise an inference of causation"). A reasonable jury could infer that Tullett would not have fired Shah in December 2012 if Levy had not repeatedly told Bovitz that Shah was engaging in illegal conduct and that Tullett would be reported for not adequately responding to the allegations.

The evidence suggests that Levy's e-mails had already caused Tullett to alter Shah's employment terms. Shah testified that he started at Tullett on July 20, 2011, and Levy sent his

6

first e-mail the next day.  Two weeks after this e-mail, Tullett modified its employment terms for Shah.  Instead of providing successive one-year terms as initially proposed, the finalized contract stated Shah could be terminated at any time provided that he was given three months' notice.  This evidence suggests that Levy's e-mails negatively impacted Shah's employment.

A reasonable jury could conclude the evidence undermines the reason Bovitz offered for Shah's termination.  Bovitz testified that he fired Shah because Shah stopped sending market commentary to certain clients.  Shah testified that he told Bovitz that he intended to remove individuals from his distribution list and that Bovitz gave him permission to do so.  While Shah's statement about what Bovitz told him may not be admitted for the truth of the matter asserted, it can be introduced to impeach Bovitz's statements to the extent they are inconsistent with the reason Bovitz provides for firing Shah.  *See* Fed. R. Evid. 613; *Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, 262 F. Supp. 2d 251, 262–63 (S.D.N.Y. 2003) ("Once a witness has offered testimonial evidence at trial concerning a particular statement, evidence that the witness previously made a statement inconsistent therewith can be introduced through the testimony of another witness to whom the trial witness allegedly made the earlier contradictory statement."); *see also* 28 Wright & Gold, Federal Practice & Procedure, § 6203 (2d ed. 2012).  In light of all the evidence, a reasonable jury could conclude that Levy's emails were the "but for" cause of Shah's termination from Tullett.

A reasonable jury similarly could conclude that Shah would have not been fired from Cuttone in April 2013 but for Levy's e-mails.  Within days of Shah being hired in March 2013, Levy sent Cuttone multiple e-mails in which he claimed to be Shah's former supervisor and demanded Shah's termination.  Cuttone fired Shah roughly one week after Levy reported to FINRA that Cuttone was "turning a blind eye" to Shah's "illegal trading and front running

7

activities." The evidence supports the inference that Levy's e-mails induced Cuttone to take action against Shah.

Levy responds by citing an e-mail from Shah to his attorney in which Shah recounts a conversation he had with Joe Cuttone. In the e-mail, Shah notes that Cuttone said, "You willfully held back [information] from us and we are going to terminate you if you are not going to resign." Levy contends that this e-mail establishes that Shah's own conduct, not his e-mails, caused his termination. However, other statements in the e-mail suggest that Levy's allegations of wrongdoing also factored into Cuttone's termination decision. As stated in the e-mail, Shah responded to Cuttone by saying:

> I did nothing wrong and you told me that also and you also told me to go after Justin[2] and fight him. Joe [Cuttone] stated, we just don't know if you did anything wrong, we are not sure.

Viewing the evidence in the light most favorable to Shah, the non-moving party, a reasonable jury could conclude that but for Levy's emails to Cuttone about Shah, Cuttone would not have terminated Shah three or four weeks after hiring him.

### B.     Defamation

Levy's motion is denied on Shah's defamation claim because the statements are libel per se. That claim has been narrowed to Levy's statements made on or after May 1, 2012. *See Shah v. Lumiere*, No. 13 Civ. 2975, 2013 WL 6283585, at *2 (S.D.N.Y. Dec. 3, 2013) (holding that "[a]ny claim for damages based upon allegedly defamatory statements prior to May 1, 2012" is time barred).

"Libel is the written form of defamation, 'the invasion of the interest in a reputation and good name.'" *Patton v. Egan*, No. 12 Civ. 2500, 2014 WL 4652489, at *6 (S.D.N.Y. Sept. 18,

---

[2]     A reasonable jury could conclude that Shah used the name Justin because Levy purported to be Justin Lumiere when sending the e-mails.

2014) (quoting *Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001)). "In New York, a plaintiff must establish five elements to recover in libel: (1) a written defamatory factual statement concerning the plaintiff; (2) publication to a third party; (3) fault; (4) falsity of the defamatory statement; and (5) special damages or per se actionability." *Chau v. Lewis*, 771 F.3d 118, 126–27 (2d Cir. 2014).

"Plaintiff's compensable injury is presumed if the defamatory statement falls within a category of libel per se." *Meloff v. N.Y. Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001). "The types of statements for which damages are presumed include those that 'charge a person with committing a serious crime' or 'tend to cause injury to a person's profession or business.'" *Patton*, 2014 WL 4652489, at *7 (quoting *Geraci v. Probst*, 938 N.E.2d 917, 922 (N.Y. 2010)). In order for a statement to tend to cause injury to a person's profession or business, it must "reflect on [the plaintiff's] performance or be incompatible with the proper conduct of [the plaintiff's] business." *Id.* (quoting *Zetes v. Stephens*, 969 N.Y.S.2d 298, 303 (4th Dep't 2013)).

At least some of Levy's e-mails constitute libel per se. Levy stated to Cuttone that Shah violates FINRA's rules, that he has "routinely been investigated by FINRA as well as the State Attorney General's Office," and that he was fired by Tullett for "his suspicious trading activities and posting on message boards." Levy made similar allegations in his July and November 2012 e-mails to Tullett. These statements could reasonably be understood to malign Shah's honesty and integrity as a businessman and are "reasonably susceptible of a defamatory meaning" concerning his profession. *Patton*, 2014 WL 4652489, at *8 (quoting *Gjonlekaj v. Sot*, 764 N.Y.S.2d 278, 280 (2d Dep't 2003)); *see BDCM Fund Adviser, L.L.C. v. Zenni*, 962 N.Y.S.2d 11, 15 (1st Dep't 2013) (holding that defendants' statement "that plaintiffs were being investigated by the SEC for insider trading" stated a claim for slander per se).

9

Levy contends that summary judgment is warranted because Shah has not shown actual damages, including special damages. In support, Levy notes that Magistrate Judge Netburn imposed discovery sanctions that preclude Shah from seeking damages for any lost clients or client commissions due to Levy's e-mails. Levy's argument is rejected. Shah is not required to prove special damages because at least some of Levy's statements constitute libel per se for which damages are presumed. *See Meloff*, 240 F.3d at 145; *Schindler v. Mejias*, 955 N.Y.S.2d 252, 253 (3rd Dep't 2012). "Presumed damages . . . include [] impairment of reputation and standing in the community, personal humiliation and mental anguish and suffering." *Van-Go Transp. Co. v. N.Y. City Bd. of Educ.*, 971 F. Supp. 90, 100 (E.D.N.Y. 1997) (internal quotation marks and citations omitted). Shah testified that, as a result of Levy's e-mails, he has made fewer media appearances and that he has suffered emotional distress. Thus, while Shah may not claim at trial that the e-mails caused him to lose clients, there still exists a triable issue regarding other kinds of damages.

Alternatively, Levy argues that Shah can recover only nominal damages. "At this stage, limiting [Shah's] damages is at best premature." *Patton,* 2014 WL 4652489, at *11; *see also Sharon v. Time, Inc.*, 599 F. Supp. 538, 586 (S.D.N.Y. 1984) (explaining that for a libel per se case, "the appropriate time to take into account the level of plaintiff's injuries is at the close of trial in the charge to the jury, or at the time a post-verdict motion on this issue is filed"). Levy's motion with regard to Shah's defamation is denied because there are factual disputes regarding damages based on Levy's statements.

## IV.     CONCLUSION

For the foregoing reasons, Levy's motion for summary judgment is DENIED.  The Clerk

of Court is directed to close the motion at Docket No. 220.

Dated:  October 31, 2016
         New York, NY

_____
**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**

11